EBERS v. GENERAL CHEMICAL CO.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
   In considering an appeal from a judgment entered on directed verdict for defendant, the Supreme Court views the testimony in the light most favorable to plaintiff.

2. NEGLIGENCE—INSECTICIDES—MANUFACTURER—COMPLIANCE    WITH GOVERNMENTAL RECOMMENDATIONS.
   Manufacturer of insecticide who claimed to have made the insecticide and advised its use in accordance with recommendations of the United States department of agriculture was not, as a matter of law, relieved of liability to user in this State for injury to peach trees because it had followed such recommendations where neither the department nor the manufacturer had made field tests of the insecticide in this State to determine whether or not under climatic and soil conditions here prevalent such insecticide would injure peach trees to which it was applied pursuant to directions given.

3. SAME—INSECTICIDES—WARRANTY—DISCLAIMER.
   Insecticide manufacturer's disclaimer of warranty would not relieve it of liability for damages to peach trees for which it represented its product was safe when used as directed if negligent in placing the product on the market in this State without proper field tests to determine its effect on peach trees here or if it gave improper directions for use and application of the product.

4. SAME—INSECTICIDES—MANUFACTURER'S DUTY AS TO DIRECTIONS—PRIVITY TO ULTIMATE USER.
   The manufacturer of an insecticide that was intended for use in combating peach borers when marketed with specific directions for use is under a duty to guard against giving improper directions for use and impliedly warrants the product to be safe for such purpose and the purchaser must, of necessity, rely upon such implied warranty and such duty, represented as per-

Liability for negligence in supplying information for the guidance of others, see 3 Restatement, Torts, § 552.

formed and relied upon as having been performed, brings the maker and ultimate user of such product into privity and for an injury arising out of a breach of such duty, impliedly warranted as performed, the sufferer of damages may reach the maker.

5. SAME — INSECTICIDES — MANUFACTURER'S BREACH OF DUTY — PRIVITY.

The implied warranty reaching from the manufacturer of an insecticide to the ultimate user is in the nature of a representation that the highest degree of care has been exercised, and a breach of such duty, inflicting damages, is a wrong in the nature of a tort and not a mere breach of contract to be counted on in assumpsit and, except in name, and to establish privity between the manufacturer and the ultimate user, it is the same thing as negligence.

6. SAME—INSECTICIDES—DANGEROUS SUBSTANCES—PRIVITY OF MANUFACTURER AND ULTIMATE USER.

Manufacturer of ethylene dichloride emulsion, made for use as insecticide on peach trees, admittedly dangerous to such trees when used in excessive strengths or not in accordance with recommendations but represented as a product that was uniformly safe when used as directed, was under obligation to use reasonable care and precaution to protect ultimate purchasers and users from injury, and such duty brought the manufacturer into privity with orchardist.

7. SAME—DANGEROUS    SUBSTANCES—MANUFACTURER—MIDDLEMAN— ULTIMATE USER.

The manufacturer of or seller of an article inherently dangerous to life or property may be liable for injuries to the ultimate consumer or user even though the latter has purchased through a middleman.

8. SAME — DANGEROUS SUBSTANCES — MANUFACTURERS — ULTIMATE USER—CONTRIBUTORY NEGLIGENCE.

The manufacturer of a dangerous substance is not an insurer that in every instance and under all circumstances no injury will result from the use of his product as directed or recommended, but if he knows or, in the exercise of reasonable care, should know that if his product is used as directed or recommended, it will cause or be likely to cause material injury, then he is liable to any person who, in reliance upon his representations, directions, and recommendations, uses the product for the purpose and in the manner directed and recommended by the manufacturer and who suffers injury as a direct result, unless it

appears that the user also knew or, in the exercise of reasonable care, should have known that the use of the product would be injurious or would be likely to cause the injuries complained of.

9. SAME—INSECTICIDES—INJURY TO TREES—EVIDENCE—RES IPSA LOQUITUR.

Injury to trees of user of insecticide was not, alone, evidence of negligence of manufacturer of such insecticide.

10. SAME—INSECTICIDES—BURDEN OF PROOF—EVIDENCE.

In action by orchardist for injury to peach trees upon which he had used insecticide manufactured by defendant, plaintiff had burden of presenting evidence establishing negligence or from which it could reasonably be inferred.

11. SAME — EVIDENCE — CIRCUMSTANTIAL EVIDENCE — PRIMA FACIE CASE.

While the happening of an accident alone is not evidence of negligence, it may be established by circumstantial evidence; and where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts, at least a *prima facie* case is made.

12. SAME—INSECTICIDES—EVIDENCE.

In action by orchardist for damages to peach trees from use of insecticide manufactured by defendant and used in accordance with recommendations accompanying the product, evidence on issue of defendant's negligence was sufficient to take the question of such negligence out of the realm of guess and conjecture and legitimately permitted the inference of fact upon which finding might be based that defendant was negligent in selling its product within this State without having made proper field tests herein and in the directions given for its application.

Appeal from Kent; Brown (William B.), J. Submitted October 11, 1944. (Docket No. 6, Calendar No. 42,756.) Decided January 2, 1945. Rehearing denied June 8, 1945.

Case by Walter H. Ebers against General Chemical Company, a corporation, for damages to peach trees alleged to have been caused by the use of a chemical produced by defendant company. Directed

verdict and judgment for defendant. Plaintiff appeals. Reversed and new trial granted.

*Linsey, Shivel, Phelps & Vander Wal,* for plaintiff.

*Warner, Norcross & Judd* and *Butzel, Eaman, Long, Gust & Bills,* for defendant.

STARR, C. J. Plaintiff is a fruit farmer in Kent county. Defendant manufactures and sells insecticides and other chemical products. In 1938 it began the manufacture of ethylene dichloride emulsion, which it sold and distributed under the trade name of E–D–E. This product was for the destruction and control of the peach tree borer, an insect whose larvae kill or damage peach trees by feeding on the cambium or inner-bark tissues of the tree. In the fall of 1940 plaintiff purchased from dealers in Kent county 30 gallons of E–D–E and applied it to about 1,700 peach trees. In 1941 over 400 of these trees died or were materially injured.

In December, 1941, plaintiff began the present suit for damages, alleging that said E–D–E caused the tree injuries; that defendant gave improper directions for its use and application; and that defendant was negligent in placing said product on the market in Michigan without first making field tests in this State to determine whether or not, under existing climatic and soil conditions, it would injure peach trees. He also alleged that the product was sold under an implied warranty by defendant that it was fit for the uses and purposes intended and would not injure peach trees. Defendant answered, disclaiming any warranty and denying the charge of negligence on its part. At the conclusion of all proofs de-

fendant's motion for a directed verdict was granted and judgment was entered in its favor. Plaintiff appeals. In considering an appeal from a judgment entered on directed verdict for defendant, we view the testimony in the light most favorable to plaintiff. *Brown* v. *Standard Oil Co.,* 309 Mich. 101; *Lebovics* v. *Howie,* 307 Mich. 326.

It appears that in 1933 the bureau of entomology and plant quarantine of the United States department of agriculture began experimenting with the chemical, ethylene dichloride, for the control of peach tree borer, and for several years conducted experiments with such chemical in the peach-growing sections of Georgia, New York, Illinois and other States. However, no experiments or field tests were made in Michigan. In March, 1938, the department issued its bulletin No. E-424 entitled "Ethylene Dichloride Emulsion for the Control of the Peach Borer." This bulletin, which was prepared by Oliver Snapp, entomologist in charge of the department's peach insect station at Fort Valley, Georgia, recommended said emulsion for the control of peach tree borers and gave directions for its use. In the same year, 1938, defendant began the manufacture and distribution of E-D-E, which was composed of ethylene dichloride, potash fish-oil soap, and water. It made laboratory tests of such product, but did not make field tests on peach trees, although it had its own facilities to do so. It prepared the product in reliance upon and in accordance with the formula and instructions of the United States department of agriculture. Defendant's senior research chemist testified in part:

"I was in charge of the development work at the Camden plant when the ethylene dichloride emulsion that defendant put out under the trade name of E-D-E was first developed and produced. * * * We

proceeded to make up the E–D–E, based on Dr. (Oliver) Snapp's original formula.   *   *   *

"We made the material in a solution that had 85 per cent. dichloride, and we had the same amount of soap present   *   *   *   as indicated in the formula recommended by Dr. Snapp.   *   *   *

"Our formula (dilution tables) for the use of the farmer was   *   *   *   based on the strength of our solution, so that the resultant diluted emulsion would be identical with that recommended by Dr. Snapp.   *   *   *

"In 1939 we put out in round numbers 18,000 gallons of 85 per cent. emulsion.   *   *   *

"The new product was put out as a 90 per cent. solution, in the fall of 1940. That meant it had 90 per cent. ethylene dichloride present by volume instead of 85 per cent.   *   *   *

"That necessarily changed slightly the formula or table of dilution strengths.   *   *   *

"With respect to the 90 per cent. solution, if it is used in exact accordance with our formulas that we publish in our literature, it will produce the final solution exactly in accordance with the recommendations of Dr. Snapp.   *   *   *   We continued to sell it in 1941 until we were unable to obtain any further quantities of raw material.   *   *   *

"It (E–D–E) was put out on the market on the original basis of information from Mr. Snapp's department, and without any tests being made by the General Chemical Company or its agricultural department, as far as I know.   *   *   *

"Ours is   *   *   *   just about the largest chemical company in the United States.   *   *   *   It has the means to test insecticides, if it so desires. They have fields equipped for testing, and access to growing peach trees if they want to test these things out.

"The only basis for putting this on the market. was the information we got from Washington, from the original report of Dr. Snapp."

The manager of agricultural chemicals research and development for defendant company testified in part:

"In recommending * * * putting this emulsion (E–D–E) into production, our company did not make any preliminary tests on peach trees * * * prior to offering the product for sale. I relied entirely upon the recommendations of the bureau of entomology of the United States department of agriculture. * * *

"I have means of making tests and experiments in the use of these insecticides. We have places * * * where tests could be made. * * * I have no knowledge at all of any tests having been made in Michigan, prior to the time that we put this on the market. * * * I know that this insecticide is of such a character that it may kill trees, if used contrary to recommendations. * * *

"I had heard rumors, as early as the summer of 1940, that this ethylene dichloride had been damaging fruit trees from Virginia north * * * and in our own State, in Delaware. Having these rumors * * * we didn't take any steps to prevent it going out on the market, because we believed then as we believe now that it was a proper product, and if used according to the formula recommended, it will do the job, and not cause tree injury."

In 1938 defendant prepared and distributed an advertising pamphlet which read in part:

"E–D–E

"KILLS PEACH TREE BORERS SAFE, ECONOMICAL WAY

"Orchard brand E–D–E brings to the peach grower, in convenient form, a new, safe and economical control for peach tree borer. Its effectiveness and relative simplicity recommend it to all growers of peaches in preference to the old methods for controlling this destructive insect. Its main and active

ingredient is ethylene dichloride. Ethylene dichloride emulsion has been recommended by the U. S. department of agriculture for the control of the peach tree borer and the following directions given for application.

"WHEN AND HOW TO APPLY

"(Quoted from Pub. E424 U. S. bureau of entomology and plant quarantine) * * *

"The emulsion can be applied either by spraying or pouring. The quantity should be regulated rather closely, since applications much in excess of the recommended dosage may cause tree injury. Applications are made by wetting the soil immediately surrounding the tree, and the lower part of the trunk should receive some of the material during the treatment. No preparation of the soil before treatment is necessary on loose, level ground. In some cases, however, cupping the soil slightly toward the tree trunk to prevent the liquid from running off, or loosening the soil around the tree sufficiently to permit the liquid to be readily absorbed, will give better results. Several shovelfuls of soil should be placed against the trunk of the tree after treatment to prevent surface loss of the fumigant. The treatment requires no later attention. * * *

"KILL THE PEACH TREE BORER BEFORE IT KILLS YOUR TREES

"Use the original E–D–E. The uniformly safe and efficient control for peach tree borer. * * *

"The foregoing information is supplied by us gratuitously and is believed to be reliable and of value, but is in no way guaranteed. The use of this material being beyond our knowledge and control and involving elements of risk to vegetation, we do not make any warranty, express or implied, as to the effects of such use, whether or not in accordance with directions or claimed so to be."

In 1940 the representative of a retail dealer handling defendant's products in Kent county gave plaintiff a copy of its above-mentioned pamphlet

advertising E–D–E, and after reading the pamphlet, plaintiff purchased 30 gallons of said product. He testified that in the first week of November, 1940, he prepared the ground around the trees, diluted the E–D–E with water, and applied it according to the directions in defendant's pamphlet. He said, "We put a certain portion of it on the trunks of all the trees." In 1941 over 400 of the 1,700 trees to which E–D–E had been applied, died or were materially injured. Plaintiff testified that examination of the injured trees indicated that the bark on the trunks was burned. He said:

"The trees we cut into where we had used this E–D–E looked as though it has been burned right around the base of the tree and showed the browning of the bark; the bark was brown, burned-like, and dead, some of them all the way around, and others would be half, two-thirds of the way around the tree.    *    *    *
"As the season continued those trees on which we had noticed this discoloration started dying off.
*    *    *    They died along all during the summer.
*    *    *    Some were injured that did not die."

Plaintiff further testified that trees in the same orchard which had not been treated with E–D–E showed no injury. He also said that the tree injuries were not caused by winter freezing. Other fruit farmers in western Michigan who treated peach trees with E–D–E in 1940 testified that many of the treated trees died or were injured, while untreated trees in the same orchards showed no injury.

It appears that in the spring of 1940 both the United States department of agriculture and defendant had received complaints from orchardists in eastern States of injury to peach trees which had been treated with ethylene dichloride preparations. Entomologist Snapp testified that he investigated

these complaints and that in practically all cases the tree injuries were caused by weather conditions or by using ethylene dichloride emulsion "at excessive strengths or * * * not in accordance with recommendations." However, in 1941 the department and defendant both changed their directions regarding the use and application of the emulsion. Defendant revised its pamphlet advertising E–D–E to read in part as follows (changes italicized):

"When And How To Apply Emulsion
"Quoted from Farmers' Bulletin No. 1861, U. S. department of agriculture. * * *
"No preparation of the soil before treatment is necessary on loose, level ground. In some cases, however, cupping the soil slightly toward the tree trunk to prevent the liquid from running off, or loosening the soil around the tree sufficiently to permit the liquid to be readily absorbed gives better results. *Any cracks in the ground around or extending out from the tree trunk should be filled with soil before treatment, to avoid undue concentration of the material on any part of the root system, which might thus be injured.*
"The material is applied, either by pouring or spraying *it on the soil around the base of the tree in such a way that the soil will absorb and hold it around the tree at the ground line. It should not be poured or sprayed on the trunk.*
"The quantity applied should be regulated rather closely, since applications much in excess of the suggested dosage may cause tree injury."

It should be noted from the above-mentioned bulletins and pamphlets that in 1938 the department of agriculture and defendant both advised that "the lower part of the trunk should receive some of the material during the treatment," while their revised instructions in 1941 stated, "it should not be poured or sprayed on the trunk." In 1941 they also advised that "any cracks in the ground around or ex-

tending out from the tree trunk should be filled with soil before treatment, to avoid undue concentration of the material on any part of the root system, which might thus be injured.'' Entomologist Snapp testified that high concentration of ethylene dichloride emulsion would injure peach trees by ''searing and killing of the tissue'' and that the department changed its directions in 1941 ''as an additional safety factor.'' However, it appears that in November, 1940, plaintiff had relied upon the directions in defendant's first pamphlet and had applied E–D–E on the trunks of his trees.

An entomologist at Michigan State College testified that he conducted field tests with E–D–E in this State and that in those tests the product did not damage peach trees. He said that in 1938, 1939 and 1940 the college recommended the use of E–D–E for the control of peach tree borer. This witness further said:

''In 1941 I learned of the trouble that these orchardists were having. I cannot say just what combination of circumstances caused the killing of the plaintiff's and others' trees. I have made an effort to learn. I am not able to say today that I know what [that] the application of E–D–E in the dosage and used according to the formula developed by Dr. Snapp will kill peach trees. *   *   *

''Dr. Snapp is the foremost authority on peach insects. *   *   *

''Q. You did come to conclusion that ethylene dichloride killed trees, didn't you? *   *   *

''A. Yes.

''Q. That it caused so much damage that it could not be recommended?

''A. I came to that conclusion.''

Bulletin No. 154 (3d Rev.) issued by the extension division of Michigan State College in March, 1942, stated: ''*Ethylene dichloride emulsion has caused*

*so much damage it cannot be recommended.''* At this point it should be noted that no field tests with ethylene dichloride emulsion had been made by Michigan State College at the time defendant began the manufacture and distribution of E–D–E.

Plaintiff applied E–D–E to his trees during the first week in November, 1940. A few days later a severe windstorm and drop in temperature occurred. An entomologist, called as an expert witness, testified as to the possible effect of such weather conditions on plaintiff's trees in part as follows:

"There certainly is a possibility  *  *  *  of whipping a tree around so as to make a trough at the base of the tree, exposing to the elements parts of the tree which might not be as able to withstand abnormal temperature exposure, which they would normally sustain if those parts were under the soil, opening up pockets where snow and ice and water could get in and freeze."

The trial court directed a verdict for defendant on the ground that there was no question of fact for jury determination. We cannot agree with such conclusion.

Defendant contends that because it manufactured E–D–E in accordance with the recommendations and formula of the United States department of agriculture, it cannot be held liable for the injuries to plaintiff's trees. This argument might be sound but for the fact that neither the department nor defendant made field tests in Michigan to determine the effect of such product on peach trees in this State, although expert testimony clearly indicated that, because of a variance in climatic and soil conditions, the effect in Michigan might be different from that in other States.

Defendant's senior research chemist testified in part:

"I did considerable work on agricultural insecticides. * * * That is a well-known rule that it is necessary to field test it before you can determine whether it is safe. That is the reason we accepted the United States department of agriculture test. I know that before you can safely apply any of these insecticides to trees they must be tested right out in the open field. That is the only way to find out whether it will kill the trees or whether it will kill the bugs."

The manager of defendant's agricultural chemicals research and development department said:

"I have found in my experience as an entomologist that it is necessary to make tests in various parts of the country on certain materials. * * * There are variations in the use of these insecticides with respect to their effectiveness and the danger inherent in their use in various parts of the country."

Entomologist Snapp, in testifying regarding the necessity of field tests in Michigan, said:

"It would be well to conduct experiments in Michigan to determine if the material works here like it does elsewhere. * * *

"*Q.* You never made observations in Michigan?
"*A.* No. * * *
"*Q.* As stated before, a chemical might work very well in Georgia but not in Michigan, isn't that true? * * *

"*A.* * * * Yes, that is true. * * *
"*Q.* It may * * * cause damage to peach trees in Michigan, where it would not cause damage to peach trees in Georgia?
"*A.* There may be a difference in the degree of injury."

In the present case we are not concerned with the effect of ethylene dichloride emulsion upon peach trees in other States where field tests were made;

we are concerned only with its effect in Michigan. It reasonably appears that defendant proceeded to distribute E–D–E in Michigan without the necessary field tests having been made in this State to determine its effect on peach trees under the existing climatic and soil conditions. We are convinced that, under the evidence presented, defendant cannot escape liability merely by showing that it followed the recommendations of the United States department of agriculture, which recommendations were based upon field tests in States other than Michigan.

Plaintiff contends that defendant's product, E–D–E, was sold to him under an implied warranty that it was fit for the uses and purposes intended, and would not injure peach trees. Defendant relies upon the above-quoted disclaimer of guarantee or warranty appearing in its advertising pamphlet. However, such disclaimer must be considered in connection with the following representations and statements appearing in the same pamphlet:

"E–D–E

"Kills Peach Tree Borers the Safe, Economical Way.

"Orchard brand E–D–E brings to the peach grower, in convenient form, a new, safe and economical control for peach tree borer. Its effectiveness and relative simplicity recommend it to all growers of peaches in preference to the old methods for controlling this destructive insect. * * *

"Kill the Peach Tree Borer Before It Kills Your Trees

"Use the original E–D–E the uniformly safe and efficient control for peach tree borer."

This was a representation by defendant that, if used as directed, its product E–D–E was safe and would not kill peach trees. If it was negligent in placing such product on the market in Michigan

without proper field tests to determine its effect on peach trees in this State, or if it gave improper directions for the use and application of the product, it cannot escape responsibility for such negligence merely by adding a disclaimer of warranty to its representation of safety. Although plaintiff claims under the theory of an implied warranty, the real question is whether or not defendant was negligent. In discussing the matter of implied warranty and negligence, in the case of *Hertzler* v. *Manshum,* 228 Mich. 416, 422, 423, which involved the sale of a package of flour containing arsenate of lead, Mr. Justice WIEST stated:

"The ultimate contemplated destination of wheat flour is human consumption. The manufacturer knows this and owes a duty to the ultimate consumer of his product to guard against poison therein, and when he markets it he impliedly warrants it free from poison and the purchaser thereof, for consumption, has a right to and must, of necessity, rely upon such implied warranty, and such duty, represented as performed and relied upon as having been performed, bring the maker and consumer of such food product into privity, and for an injury arising out of a breach of such duty, impliedly warranted as performed, the sufferer may reach the one in fact inflicting the injury.

"The implied warranty, so-called, reaching from the manufacturer of food stuffs to the ultimate purchaser for immediate consumption is in the nature of a representation that the highest degree of care has been exercised and a breach of such duty inflicting personal injury is a wrong in the nature of a tort and not a mere breach of contract to be counted on in assumpsit. *Except in name and to establish privity between the manufacturer and the ultimate consumer it is the same thing as negligence. Plaintiff's case, in its last analysis, is bottomed on negligence.*"

See, also, *Macres* v. *Coca-Cola Bottling Co., Inc.,* 290 Mich. 567; *MacPherson* v. *Buick Motor Company,* 217 N. Y. 382 (111 N. E. 1050, L. R. A. 1916 F, 696, Ann. Cas. 1916 C, 440); *E. I. Du Pont De Nemours & Co.* v. *Baridon* (C. C. A.), 73 Fed. (2d) 26; 45 C. J. p. 1194.

Defendant further contends that it cannot be held liable because there was no privity of contract between it and plaintiff. It is admitted that ethylene dichloride emulsion, when used "at excessive strengths or * * * not in accordance with recommendations" is dangerous and will kill or injure peach trees. Defendant represented the product to be "uniformly safe" and that when used as directed it would not kill peach trees. Under such representation and with knowledge that its product was inherently dangerous, it was defendant's duty to use reasonable care and precaution to protect ultimate purchasers and users, including plaintiff, from injury. Such duty brought defendant, as the manufacturer and distributor, into privity with plaintiff, as the purchaser and user. Therefore, the question presented is whether or not defendant breached its duty to plaintiff; in other words, was it negligent in the discharge of its duty? In *Kolberg* v. *Sherwin-Williams Company,* 93 Cal. App. 609, 613 (269 Pac. 975), the court said:

"The liability of the defendants rests upon the sound rule that a manufacturer or seller of an article inherently dangerous to life or property is liable for injuries to the ultimate consumer who has purchased through a middleman. (17 A. L. R. 674, 683.)"

In the case of *E. I. Du Pont De Nemours & Co.* v. *Baridon, supra,* involving the liability of the manufacturer of a seed disinfectant or fungicide for damage resulting from its use, the court said (p. 30):

"A rule which would permit a manufacturing chemist, who offered his product to the public for use in the treatment of plants or animals, to so carelessly prepare his product or to so carelessly direct the manner in which it was to be used as to destroy or injure the property of one who purchased it from a dealer and who in ignorance of its dangers used it for its intended purpose and in accordance with the directions of the manufacturer, and which would deny to the person whose property was injured any redress, although the destruction of his property was the natural, probable, and almost certain consequence of the manufacturer's negligence, should not, we think, receive the sanction of this or any other court. Our conclusion is that a manufacturer of a proprietary product intended for the specific purpose of preventing or curing the diseases of plants, animals, or human beings, which product when properly used for its intended purpose is either harmless or beneficial, but which when improperly used will cause or is likely to cause material injury, who undertakes to direct or recommend the manner in which it shall be used, owes the duty to those whom the manufacturer, through his advertising and representations, invites to purchase and use the product, of exercising reasonable care commensurate with the dangers involved in giving such directions and in the making of such recommendations. The manufacturer is not an insurer that in every instance and under all circumstances no injury will result from the use of his product as directed or recommended, but if he knows or in the exercise of reasonable care should know that if his product is used as directed or recommended it will cause or be likely to cause material injury, then he is liable to any person who, in reliance upon his representations, directions, and recommendations, uses the product for the purpose and in the manner directed and recommended by the manufacturer and who suffers injury as a direct result, unless it appears that

the user also knew or in the exercise of reasonable care should have known that the use of the product would be injurious or would be likely to cause the injuries complained of." (See authorities cited.)

See, also, *MacPherson* v. *Buick Motor Company, supra; Macres* v. *Coca-Cola Bottling Co., Inc., supra; Pesavento* v. *E. I. Du Pont de Nemours & Co.,* 240 Mich. 434; *Murphy* v. *Sioux Falls Serum Co.,* 44 S. D. 421 (184 N. W. 252); 2 Restatement of the Law of Torts, pp. 1039–1084, §§ 388–397.

The injury to plaintiff's trees alone was not evidence of defendant's negligence. The burden was on plaintiff to present evidence establishing negligence or from which it could reasonably be inferred. In *Burghardt* v. *Detroit United Railway,* 206 Mich. 545 (5 A. L. R. 1333), we said:

"We have uniformly held that the happening of the accident alone is not evidence of negligence; and we have as uniformly held that negligence may be established by circumstantial evidence, and that where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts that at least a *prima facie* case is made."

See, also, *Macres* v. *Coca-Cola Bottling Co., Inc., supra; Smolenski* v. *Libby, McNeill & Libby,* 280 Mich. 329; *O'Neill* v. *James,* 138 Mich. 567 (68 L. R. A. 342, 110 Am. St. Rep. 321, 5 Ann. Cas. 177, 17 Am. Neg. Rep. 561).

We are convinced that the evidence in the present case established facts taking the question of defendant's negligence out of the realm of guess and conjecture, and from which legitimate inferences might be drawn.

What caused the injury to plaintiff's trees? Was it caused by the product E–D–E, or by weather con-

ditions, or by other factors? The testimony of the several entomologists indicates that they were uncertain as to the cause of the injury. If it is determined that the injury was caused by E–D–E, then the further question arises as to whether or not defendant was negligent in distributing such product in Michigan without proper field tests having been made in this State to determine its effect on peach trees. Questions also arise as to whether or not defendant was negligent in the directions it gave for the use and application of E–D–E and as to whether or not plaintiff applied it according to directions. The evidence presents these and other questions of fact, upon which the minds of reasonable men might differ. Such questions of fact should have been submitted for jury determination.

We conclude that the trial court erred in directing verdict for defendant. The judgment for defendant is reversed and a new trial granted. Plaintiff may recover the costs of both courts.

NORTH, WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.