L. A. No. 19972. In Bank. May 6, 1947.]

VAL TINGEY, a Minor, etc., et al., Respondents, v. E. F.
HOUGHTON & CO. (a Corporation), Appellant.

[L. A. No. 19973. In Bank. May 6, 1947.]

RAYMOND HULSIZER, Respondent, v. E. F. HOUGHTON
& CO. (a Corporation), Appellant.

Chase, Barnes & Chase, Stanley N. Barnes and Donn B. Downen, Jr., for Appellant.

Hildebrand, Bills & McLeod, Angus C. McBain and Leonard J. Dieden for Respondents.

GIBSON, C. J.—These cases involve identical issues of law and fact, both arising out of an explosion of chemicals sold by defendant to the Fray Tool and Reamer Company. In the first case the widow and children of Tingey, an employee of the tool company, sought damages for his wrongful death, and in the second case, Hulsizer, also an employee, claimed damages for injuries suffered in the same accident. Defendant has appealed from judgments based on verdicts in both cases, contending that the evidence is insufficient to support the implied finding of negligence.

The testimony is conflicting in many respects and is not as clear as might be desired on some matters, but in accordance with the established rule all conflicts must be resolved in favor of respondents and all permissible inferences drawn to uphold the judgments.

A few weeks prior to the accident, the tool company installed an apparatus called a "draw pot," which was designed to heat chemical salts beyond the melting point to form a liquid used for heat-treating tool steel. The equipment consisted of a thick cast-iron pot, supported in a standard and heated by gas and air under pressure. Defendant, after examining the equipment and investigating the tool company's requirements, recommended its product, Liquid Heat Quench, for the desired service. An order was placed with defendant for one drum of Liquid Heat Quench and one drum of another salt called "Draw Temp," also used for treating steel. The Liquid Heat Quench was capable of transferring heat up to 1500 degrees, while the Draw Temp salt functioned at a lower temperature. Defendant's salesman, referring to

Liquid Heat Quench, stated that "this new salt was not dangerous," and compared it with salt containing cyanide which gives off "extremely dangerous fumes."

The tool company's superintendent examined the containers when they arrived at the plant. He testified that the name "Liquid Heat Quench" was stenciled on one drum, but that it had no label or other markings. The Draw Temp drum had a colored label giving the name of the product and stating that its purpose was "for use in heat-treating" and that it "was not to be used in a container that had previously held potassium cyanide."

About one week prior to the accident the superintendent, with Tingey present, opened both drums and examined the contents. The salt in the Liquid Heat Quench drum was a "yellowish gray" and "dirty looking" granular compound. The salt in the Draw Temp drum appeared to be "a little lighter, but it was in a hard chunk." The lids on both drums were replaced, and the contents of the Liquid Heat Quench drum were not disturbed until Tingey prepared to heat-treat some steel on the day of the accident. The two drums were then moved close to the pot, and Tingey and the superintendent loosened the lid on the Liquid Heat Quench container. The superintendent, after observing that Tingey had turned on the gas and was adjusting the burner under the pot, left the plant on an errand. The draw pot, which held approximately two and a half gallons, was then new and clean and no salt had, as yet, been placed in it.

Plaintiff Hulsizer, observing the heating operations immediately before the accident, noticed one salt container with no lid on it standing alongside the draw pot. He saw only the one drum, and no salt was transferred from it to the pot while he was present. The salt came up to within four or five inches of the top of the drum and the draw pot was then about two-thirds full of "grayish" salt. The salt in the pot had not begun to melt and "it looked just like what was in the can then." There was a label on the open drum which stated that melting would begin at 300 to 350 degrees Fahrenheit, and Hulsizer noted that the thermometer connected with the draw pot registered around 300 degrees. He did not see either "Liquid Heat Quench" or "Draw Temp" on the label or elsewhere on the drum.

The explosion occurred about a minute after Hulsizer looked at the thermometer. There was a loud noise, a big flash in

the draw pot, and the plant filled with smoke. A few seconds later there was a second and more violent explosion followed by a loud "shush" and a slight blaze. The Liquid Heat Quench drum was blown to pieces. The Draw Temp container stood intact and its screw-type lid was on but loosened so that a half turn was necessary to tighten it. This drum was removed by defendant several days after the accident, and it was not returned nor was its disposition explained.

Defendant's plant manager, who had charge of the manufacture of the products sent to the tool company and who was a chemist and metallurgist, testified at length with respect to the manner in which the salts were compounded at the factory. He stated that all products are made from a formula, the original of which is retained in the safe at the plant. The formula is compounded in a room separate from the shipping room, and, before any material leaves the compound room, a test is made of a sample. The product is then either put in storage or sent to the shipping room. Before the material is shipped, a sample is taken from the container and a second test is made and approved. A sample of salt assertedly taken from the batch of Liquid Heat Quench manufactured for shipment to the tool company was introduced in evidence. It was pure white in color.

The plant manager testified that Liquid Heat Quench is not grayish in color but is a white, granular compound coarser than table salt. Draw Temp salts are white with a little yellow tinge or "cream white." He said that these salts, when heated alone, and not mixed together or containing any foreign material, will not become dangerous or explode no matter how much heat is applied, but that, if mixed together or if certain other substances are added, they will be explosive when heated. Specifically, it appears that Liquid Heat Quench, containing cyanide, will be explosive at elevated temperatures if nitrates, water or a large percentage of moisture is present. Further, cyanide is a "fire hazard" if acid gets to it and forms a gas. Draw Temp will explode on heating, if carbonizing material, moisture or cyanide is added, or if it is brought in contact with a combustible material. Liquid Heat Quench starts to melt at 950 degrees and has a working range up to 1500 degrees.

Another expert witness called by defendant testified that if Liquid Heat Quench and Draw Temp were mixed, an explosion would occur if and when the mixture reached a temperature of from 300 to 350 degrees, and, as we have seen,

the explosion did occur about a minute after the temperature had risen to slightly above 300 degrees.

The evidence is clearly sufficient to support a finding that the contents of the Liquid Heat Quench drum when shipped contained impurities which defendant should have discovered, and that the explosions resulted from a contamination of the salt by some foreign substance. When the salt in the Liquid Heat Quench drum was inspected by the superintendent of the tool company shortly after it was delivered, it was not white, as it was supposed to be if pure, but was a dirty yellowish-gray color. Draw Temp, however, normally has a "yellow tinge," or "cream white" color, and the testimony of the superintendent, therefore, would justify an inference that some Draw Temp salt was then present in the Liquid Heat Quench drum. The Liquid Heat Quench drum was closed by a snap-on lid, and the jury could properly have rejected the rather remote possibility that a foreign substance was introduced during shipment. Moreover, there is testimony that the contents were not tampered with or exposed to contamination after the drums were delivered to the tool company. There is no evidence that the Draw Temp drum was ever opened after delivery except when it was inspected by the tool company superintendent, and it was found intact with the lid screwed on after the explosion. The Draw Temp drum was taken away from the plant by defendant, its disposition was not explained, and there was no evidence indicating that the contents, which were in the form of a "hard chunk," had ever been disturbed or any part thereof removed. The Liquid Heat Quench drum was not opened after it was inspected by the superintendent until the lid was removed by Tingey in preparation for the heat-treating operation shortly before the explosion. Accordingly it is permissible to infer that the discoloration of the Liquid Heat Quench was caused by the presence of Draw Temp or other foreign substance, and that the contamination occurred before the drum left defendant's factory.

Although the testimony of the plant manager, if believed by the jury, would indicate that defendant exercised great care to prevent contamination, it is not sufficient as a matter of law, under all of the facts of this case, to compel a finding that the product was pure when shipped. It does not necessarily follow from the fact that defendant ordinarily exercised great care that departures from the usual practice were never made. Moreover, the testimony of the tool com-

pany superintendent, that the contents of the Liquid Heat Quench drum were a dirty, yellowish-gray color when he made his inspection shortly after delivery, is in conflict with defendant's claim that the product shipped was the same as the pure white sample assertedly taken from the batch compounded for the tool company. In passing on the credibility of witnesses and the weight to be given to their testimony, the jury is entitled to consider their interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence (*Blank* v. *Coffin,* 20 Cal.2d 457, 461-462 [126 P.2d 868]; Code Civ. Proc., § 1847).

The jury could properly conclude, therefore, that some foreign substance which discolored the salt was present in the Liquid Heat Quench drum when shipped, that defendant was fully aware of the dangerous consequences which would follow from contamination when the salts were used in a normal manner, that it negligently failed to discover the defective condition of its product, and that the explosion resulted from this defect.

There is also evidence which will support a recovery on an entirely different theory. The expert witness called by defendant testified that in his opinion the first explosion was caused by the accidental mixing of some of the Liquid Heat Quench with the Draw Temp "just prior to" the explosion, and that when some of the material was blown out of the pot it came into contact with the Liquid Heat Quench in the container, causing the second explosion. Accepting this theory, which compels the conclusion that the mixing or contaminating was done in the tool company's plant by Tingey or some other employee of the tool company, the jury nevertheless could have found that the mixing, with the resulting explosion, was a direct consequence of defendant's negligence in failing to give an adequate warning of the dangerous nature of its products. ■ The courts have frequently ruled that a manufacturer must give an appropriate warning of any known dangers which the user of his product would not ordinarily discover. (*Farley* v. *Edward E. Tower & Co.,* 271 Mass. 230 [171 N.E. 639, 86 A.L.R. 941]; *Genesee County etc. Assn.* v. *Sonneborn Sons, Inc.,* 263 N.Y. 463 [189 N.E. 551]; *Clement* v. *Crosby & Co.,* 148 Mich. 293 [111 N.W. 745, 12 Ann.Cas. 265, 10 L.R.A.N.S. 588]; *Orr* v. *Shell Oil Co.,* 352 Mo. 288 [177 S.W.2d 608]; see *Stultz* v. *Benson Lumber Co.,* 6 Cal.2d 688, 690 [59 P.2d 100]; Rest., Torts, § 388; 86 A.L.R.

947.) There is a particular need for a sufficient warning where, as here, there is a representation that the product is not dangerous. (Cf. *Maize* v. *Atlantic Ref. Co.*, 352 Pa. 51 [41 A.2d 850]; *Henry* v. *Crook*, 202 App.Div. 19 [195 N.Y.S. 642].) There was a sharp conflict in the evidence with reference to the labels on the two drums, and if this conflict is resolved, as it must be, in favor of the plaintiffs, it appears that there was no warning whatsoever on the Liquid Heat Quench drum. The Draw Temp drum was removed by defendant and was not introduced in evidence, but it appears from the testimony that there was a statement on the drum that the product should not be used "in a container that had previously held potassium cyanide." There was no warning, however, by label or otherwise that Liquid Heat Quench contained cyanide; to the contrary, defendant's salesman in stating that "this new salt" was not dangerous, contrasted it with products containing cyanide, which gives off "extremely dangerous" fumes.

The likelihood of an accident taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient label. (See Rest., Torts, §§ 291, 388, comment 1, pp. 1051-1052; § 397, comments (b-d).) Defendant knew of all the perils involved, and it was for the jury to determine whether defendant should have foreseen that workers in the tool company's shop might fail to take all necessary precautions to avoid contamination in the absence of a warning. On the other hand, the jury could properly conclude that without such a warning label neither Tingey nor any other tool company employee was bound to anticipate that there would be a violent chemical reaction or explosion upon the mixing and heating of the two salts, both of which were intended for the same method of use and the same general purpose.

Since the verdicts are supported by specific evidence of negligence, it is unnecessary to pass upon the contentions of the parties with respect to the applicability of the doctrine of res ipsa loquitur.

The judgments are affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied May 29, 1947.