Evelyn L. BOYL, Plaintiff,

v.

CALIFORNIA CHEMICAL COMPANY, a corporation, Defendant.

Civ. No. 62-240.

United States District Court
D. Oregon.
Sept. 11, 1963.

Glenn R. Jack, Jack, Goodwin & Anicker, Oregon City, Or., for plaintiff.

R. E. Kriesien, Portland, Or., for defendant.

EAST, District Judge.

This action was tried to the Court without a jury, and it appears from the evidence that:

## DEFENDANT AND PRODUCT

Defendant is a large manufacturer of agricultural-treating chemical products in the United States with more than 25 years' experience in the formulation, experimentation, producing and selling of such chemical products, many of which have extreme toxicity and lethal potentials to humans, and through such endeavors has acquired outstanding and leading expertise in the field.

The defendant has over this period of time and in the regular course of its business, formulated, produced and sold to the general public, including a vast market among the home, or do-it-yourself garden-type consumer, throughout the country, great quantities of a liquid vegetation-growth preventative (weed killer) under the trade name of "Triox";

Substantially 50% of the Triox solution is a chemical compound referred to as sodium arsenite, which compound is compared as being four to six times as toxic to humans as arsenide trioxide (rat poison); the minimum human lethal dosage of sodium arsenite is 20 to 30 milligrams and it is a very stable compound with long-lasting toxic contamination propensities, and a disabling dosage of the compound, varying in degrees to fatal, can be taken into the human bloodstream by way of absorption through the skin or by inhalation as readily as by ingestion.

## PLAINTIFF

Plaintiff is an energetic 41-year old housewife and mother of normal health, with various and extended family, neighborhood and social activities; however, pertinent here only because defendant contends she is an allergenic; she had in the past, while in college, one serious bout with poison oak, and more recently several allergy reactions, though of short duration and inconsequential, from eating fruits and using some laundry detergents;

She hold a college B.S. degree in home economics, with attending basic courses and studies in chemistry, but has had no experience in the handling of toxic chemicals, no prior experience with Triox, and no prior knowledge whatsoever of the compound sodium arsenite or of its long-lasting toxic propensities.

## PLAINTIFF'S USE OF TRIOX

During the latter part of May, 1960, plaintiff purchased from a third party retail outlet a quart-sized can of the Triox product for the intended ultimate use on weed growth in and about the driveway of her residence,[1] and the container so purchased exhibited the following pertinent labels and warnings:

[FRONT OF CAN]

### ORTHO
### T R I O X

#### KILLS VEGETATION
An Arsenical Weed Killer!
Prevents Plant Growth for 1 to 2 years

Use on driveways, brick walks, paths, tile patios, tennis courts, parking areas; along fence lines, curbs and gutters; around garages, house foundations and other structures, where soil can be poisoned and no plant growth is wanted.

| POISON [Skull and crossbones] | | |
|---|---|---|
| Active Ingredient | | by Wt. |
| Sodium Arsenite ($NaAsO_2$) | ............. | 55% |
| Inert Ingredients | ...................... | 45% |
| Equivalent to 41.9% of arsenic trioxide. | | |
| Arsenic expressed as metallic, all in water-soluble form | ............... | 31.7% |
| Pounds Arsenic Trioxide per gallon at 68° F. | ...................... | 6 |

#### DO NOT USE ON LAWNS

1. Plaintiff testified in her discovery deposition:

"Q * * * How did you happen to purchase that particular product? By that, I mean, had you used it previously?
"A No, I hadn't.
"Q All right. Tell me the circumstances under which you decided to buy this product.
"A I had been weeding, and I got tired of weeding, and the grass coming back in the driveway all the time, and one of my neighbors informed me Triox would actually kill this grass for a period of two years, and it went down into the roots of the grass and it disappeared and you wouldn't have to weed any more, so this sounded like an easy life, and I purchased the Triox and decided to do my weeding in this manner.
"Q Where did you purchase the Triox?
"A Oak Grove Supply.
"Q Did you talk to a salesman about the product?
"A No.
"Q You just went in an asked for it by name?
"A Uh-huh." (Tr. 7, 8)

[RIGHT SIDE OF CAN]

TRIOX
KILLS WEEDS IN
[picture]
Tile Patios
[picture]
Curbs and Gutters
[picture]
Brick Walks
Driveways
Paths
Tennis Courts
Parking Areas
Along Fence Lines

USE WHERE SOIL CAN BE POISONED AND NO PLANT
GROWTH IS WANTED

---

[LEFT SIDE OF CAN]

Manufactured by [manufacturer's name and address omitted.]

---

[BACK OF CAN]

DILUTION TABLE
[omitted]

READ ENTIRE LABEL. USE STRICTLY IN ACCORDANCE WITH LABEL CAUTIONS, WARNINGS AND DIRECTIONS.

TO POISON SOIL AND PREVENT PLANT GROWTH: [Dilution and instruction of preparation of ground—omitted]

TO KILL ANNUAL WEEDS AND TOP GROWTH OF PERENNIAL WEEDS: [Dilution and instruction of application—omitted]

NOTE: INSTRUCTIONS AS TO FREEZING TEMPERATURES [omitted]

*WARNING:* TRIOX is a strong poison. It should be kept away from children and animals. Avoid breathing spray mist. Avoid contact with skin, eyes, or clothing. Wash thoroughly after using. Avoid getting TRIOX into cuts, sores, etc. Should this occur, wash off at once. Livestock and poultry will be poisoned if allowed to feed on treated areas.[2] Avoid getting TRIOX on painted surfaces as peeling of paint will occur. Rinse spray hoses thoroughly after use as TRIOX will deteriorate hose materials. *When container is empty, immediately wash thoroughly and destroy.* Never re-use.[3]

[poison skull & cross bones] ANTIDOTE FOR ARSENIC: Give a tablespoonful of salt in a glass of warm water and repeat until vomit fluid is clear. Then give two tablespoonfuls of Epsom Salts or Milk of Magnesia in water and plenty of milk and water. Have victim lie down and keep quiet. CALL A PHYSICIAN IMMEDIATELY.

---

2. Indicative of defendant's knowledge of long-lasting earth-contaminating potentials of sodium arsenite.

3. Italicized to indicate defendant's knowledge of the stability of sodium arsenite.

NOTICE: California Spray-Chemical Corporation makes no warranty, express or implied, concerning this material, except that it conforms to the chemical description on the label. Neither California Spray-Chemical Corporation nor the seller shall be held responsible in any manner for *any personal injury* or property damage or other type of loss resulting from the handling, storage or use of this material.[4] The buyer assumes all risk and liability therefrom and accepts and uses this material on these conditions.

On May 27, 1960 (a Friday), plaintiff proceeded to apply the Triox, and after perusing the labels and warnings on the container she put on protective clothing such as gloves and a scarf, and then proceeded, while standing windward, to apply the Triox to the driveway area with the use of a backpack air-pressure spray pump;

That after applying the bulk of the Triox solution in the spray tank, she thereupon rinsed the spray tank with garden hose water and poured out the rinse water containing the tank residue of Triox upon a "waste area" (rough grass area) of the back yard immediately adjoining a clear patio space;

That afternoon plaintiff and her family motored to the Oregon beach area for the Memorial Day weekend, and plaintiff recalls no physical malfunctioning effects or discomforts from her spraying activities except for a bad headache during the same evening.

### INJURY

On the following Wednesday early afternoon the weather was sunny and warm and plaintiff, while dressed in a "bra and shorts" type sunsuit, had just finished hanging a clothes washing on the dryer rack in the patio area when she unwittingly lay stomach down for a sunning in the rough grass area where she had poured out the Triox rinse;

Very shortly thereafter she noticed a "heat rash" and severe itching about her thighs, and within half an hour she broke out with red spots followed by hives; thereafter, her condition worsened in that her body became generally swollen, and by 6:00 P.M. she was dizzy and confused and had developed muscle tremors and twitching, and by 7:00 to 8:00 P.M. she had been and was hospitalized for the following three days, during the first 24-hour period of which hospitalization her worsened physical condition was listed as critical. No useful purpose will be here served by further describing plaintiff's symptoms, physical malfunctioning and disabilities nor the medical treatment therefor extended over some 18 months, as I am satisfied from the medical expert testimony that plaintiff's acute physical malfunctioning immediately following the exposure, with resulting disability during the slow recovery, was due to the introduction into her blood supply through skin absorption and inhalation of an intolerable quantity of toxic sodium arsenite during the time she lay upon the ground which had been contaminated with the Triox rinse.

### DUTY TO WARN

I conclude that with its experience and expertise the defendant knew or should have known of the stable quality (see n. 3) and long-lasting contamination propensities of the sodium arsenite contained in the Triox solution upon the earth (see n. 2) and of the hazard or danger to humans coming in contact with such contaminated earth;

Further, that a prudent producer of such a potential danger to humans would reasonably foresee an injury such as that sustained by plaintiff in the ab-

---

**4.** Italicized to indicate total absence of instructions as to disposal of rinse water, or warning or suggestion of delayed danger to persons from disposed-of residue.

sence of, or but for some reasonable notice or warning concerning a safe disposal of the rinse residue after the use of the product for the intended purpose for which it was produced and sold. (see n. 4).

Harper and James, in their Law of Torts, Vol. 2, reminds us that:

"(k)nowledge is fundamental to liability for negligence. The very concept of negligence presupposes that the actor either does foresee an unreasonable risk of injury, or could foresee it if he conducted himself as a reasonably prudent man. Foreseeability of harm, in turn, unless it is to depend on supernatural revelation, must depend on knowledge." p. 907.

"The next problem concerns the extent to which a man will be held to matters of common knowledge * * *"

and

"(p)robably everyone will be treated as though he knew certain fundamental facts and laws of nature which belong to universal human experience, * * *" pp. 911–12.

Also, that

"(i)n addition to the knowledge and experience with which people generally will be charged in conducting the ordinary affairs of life, men who engage in certain activities or come into certain relationships with people or things are under peculiar obligation to acquire knowledge and experience about that * * * thing." p. 915.

"(a)s scientific knowledge advances, more risks can be discovered and avoided. Those who deal with matters affected by these advances must keep reasonably abreast of them. * * * In the last century little was known of allergies and a manufacturer could scarcely be charged with knowledge that chrome-mordanted stockings might produce ulceration. Today the manufacturer must acquire knowledge of such things."

and then in summation:

"(p)erception of the risk is the sum of all that has heretofore been dealt with in this section. It is the correlation of past experience with the specific facts in a situation. If a reasonable man with the actor's own knowledge and experience plus the knowledge and experience with which he is charged would perceive a risk in the conduct in question the actor will be held to perceiving that risk." p. 916.

So, today a manufacturer who undertakes to produce and sell to the general public a product with high risk of human harm must provide specification, instruction, and warning, so that it is reasonably safe for ordinary persons to use it, *not only* for the purposes for which it is produced and intended to be used *but also* all other necessarily incidental and attendant uses (such as storage or disposal) and to give reasonable notice and warning of after or delayed effect or latent or lingering dangers not known or reasonably to be expected by the ordinary user, but which are "foreseeably probable" to the manufacturer with his expertise.[5]

"* * * one of the most common requirements of care is the giving of

---

5. (a) "The maker of an article for sale or use by others must use reasonable care and skill in designing it and in providing specifications for it so that it is reasonably safe for the purposes for which it is intended, and for other uses which are foreseeably probable.* And a person who undertakes such manufacturing will be held to the skill of an expert in that business and to an expert's knowledge of the arts, materials and processes. Thus he must keep reasonably abreast of scientific knowledge and discoveries touching his product ** * * * He may also be required to make tests to determine the propensities and dangers of his prod-

reasonable warning or instructions for safe use where the prudent maker would foresee that a condition or propensity of the product is likely not to be fully known and appreciated by those using it, and that some use to which the article is likely to be put will be unreasonably dangerous without that knowledge. Where the use of an article is safer if the user follows a certain procedure or takes certain precautions, not commonly known, the duty of care may require the maker to take reasonable steps to advise potential users." Harper and James, supra, p. 1547.

For a clear application of a duty based upon knowledge through expertise and a failure to perform in giving reasonable notice and instructions, see Hopkins v. E. I. DuPont De Nemours, 199 F.2d 930 (3rd Cir. 1952) (reversed on other grounds, 212 F.2d 623). The opinion relates that everyone knows that dynamite is dangerous, but the maker, because of its technical knowledge, should have foreseen a danger or risk of a premature explosion, while persons working with the dynamite without such technical information, might not have foreseen it and that, therefore, the maker had a duty to give people warning and precaution against a detonating risk to plaintiff from heat being generated and radiating from a nearby hole being then drilled.

## DEFENDANT'S FAILURE TO WARN AND LIABILITY

A perusal of the warnings and instructions on the can of Triox here tells us in no uncertain words that Triox is "an arsenical * * *" compound and that it contains a large quantity of "sodium arsenite" and that such solution is "poison," as I am sure everyone knows. The warning gives an antidote for *internal* ingestion. Also, directions for prevention of personal injury *while using and applying the liquid*; however, no warning or protective advice whatsoever as to disposal of the fluid or of any risk to unadvised persons from the stability or long-lasting qualities or propensities and lingering risks of the liquid after returning to a dry or solid form is

---

uct.*** " Harper and James, The Law of Torts, Vol. 2, p. 1541

* Wolcho v. Arthur J. Rosenbluth & Co., 81 Conn. 358, 71 A. 566, 21 L. R.A.,N.S., 571 (1908) ; Clement v. Crosby & Co., 148 Mich. 293, 111 N.W. 745, 10 L.R.A.,N.S., 588 (1907) (stove polish intended for use on cold stoves applied on hot stoves) ; Farley v. Edward E. Tower Co., 271 Mass. 230, 171 N.E. 639, 86 A.L.R. 941 (1930) (combs to set hair after wet wave "before retiring" used when hair was dried by hair-drier). Cf. Tingey v. E. F. Houghton & Co., 30 Cal.2d 97, 179 P.2d 807 (1947) (maker bound to anticipate contamination of product in course of ordinary use.)

** Dillard and Hart, Product Liability; Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 160 (1955). Cf. Seward v. Natural Gas Co., 11 N. J.Super. 144, 78 A.2d 129 (1950) ; Cornbrooks v. Terminal Barber Shops, 282 N.Y. 217, 26 N.E.2d 25 (1940).

*** Walton v. Sherwin-Williams Co., 191 F.2d 277 (8th Cir. 1951) ; Chapman Chemical Co. v. Taylor, 215 Ark. 630, 222 S.W.2d 820 (1949) ; Ebers v. General Chemical Co., 310 Mich. 261, 17 N.W.2d 176 (1945) ; Zesch v. Abrasive Co., 353 Mo. 558, 183 S.W. 2d 140, 156 A.L.R. 469 (1944) ; Dillard and Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 159 (1955) ; Note, 3 Vand.L.Rev. 341 (1950).

(b) The likelihood of an accident taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient label. See Rest., Torts, §§ 291, 388, Comment 1, pp. 1051–1052; § 397, Comments b–d. Defendant knew of all the perils involved, and it was for the jury to determine whether defendant should have foreseen that workers in the tool company's shop might fail to take all necessary precautions to avoid contamination in the absence of a warning. On the other hand, the jury could properly conclude that without such a warning label neither Tingey nor any other tool company employee was bound to anticipate that there would be a violent chemical reaction or explosion upon the mixing and heating of the two salts, both of which were intended for the same method of use and the same general purpose. Tingey, supra, 179 P.2d p. 811.

given, or even reasonably inferable.[6] In fact, the directions as to use and advice as to avoiding skin or other personal contact with the liquid or breathing the spray mist of Triox and the washing of the person after using, and total lack of advice as to disposal of the rinse, could mislead a user to concluding that there was no lingering risk after immediate use and airwashing.[7]

From the foregoing, I conclude that the defendant was negligent towards plaintiff in failing to give any reasonable notice or warning of a risk or danger to her personal safety from contact with earth lately contaminated with the Triox solution and that such negligence on the part of the defendant was the proximate cause of plaintiff's resulting physical malfunctioning and disabilities.

## PLAINTIFF'S LACK OF CONTRIBUTORY NEGLIGENCE

 I find from the evidence that plaintiff was totally ignorant of any risk or danger to herself arising from the Triox solution contaminated earth and that she had no notice or knowledge that the same constituted a risk or danger to her own safety. I conclude that she was not contributorily negligent to her own safety in the premises.

## DAMAGES

I fix plaintiff's damages to be recoverable from the defendant herein in the amount of $7500.00 general damages and $410.60 special medical damages.

This opinion shall stand as this Court's findings of fact and conclusions of law in the adjudication of the above entitled cause; as provided by Rule 52, F.R.Civ. P., and the Clerk of this Court is directed to forthwith enter judgment in favor of plaintiff and against the defendant for the sum of $7910.60 and her costs of action, per Form 32, Appendix of Forms, F.R.Civ.P

---

6. (a) "* * * one of the most common requirements of care is the giving of reasonable warning or instructions for safe use * where the prudent maker would foresee that a condition or propensity of the product is likely not to be fully known and appreciated by those using it, and that some use to which the article is likely to be put will be unreasonably dangerous without that knowledge.** Where the use of an article is safer if the user follows a certain procedure or takes certain precautions, not commonly known, the duty of care may require the maker to take reasonable steps to advise potential users." Harper and James, supra, p. 1547.

 * Warnings and instructions are not necessarily the same. The former call attention to danger; the latter prescribe procedures for efficient use of the product and for avoiding danger. A manufacturer might provide one and still be liable in failing to provide the other, as where instructions fail to alert the user to the danger they seek to avert, or where a warning alerts the user to a peril but does not enable him to avoid it. See E. I. Du Pont de Nemours & Co. v. Baridon, 73 F.2d 26 (8th Cir. 1934); J. C. Lewis Motor Co. v. Williams, 85 Ga.App. 538, 69

S.E.2d 816 (1952); Ebers v. General Chemical Co., 310 Mich. 261, 17 N.W. 2d 176 (1945).
 ** Tomao v. A. P. De Sanno & Son, Inc., 209 F.2d 544 (3rd Cir. 1954); Farley v. Edward E. Tower Co., 271 Mass. 230, 171 N.E. 639, 86 A.L.R. 941 (1930); Maize v. Atlantic Ref. Co., 352 Pa. 51, 41 A.2d 850, 160 A. L.R. 449 (1945); sources cited note 2 supra; 2 Restatement of Torts § 388; cf. id. §§ 284, 397.

(b) Delineation of a duty to warn of unknown propensities of sulphuric acid, see Gall v. Union Ice Co., 108 Cal.App.2d 303, 239 P.2d 48, cited in American Law of Products Liability, Hursh, § 2:47, p. 209.

7. "Directions for use may not discharge the maker's duty (to warn) if failure to follow directions will involve danger not apparent to the user who has not been warned.* " Harper and James, supra, p. 1549.
 * McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E. 2d 712 (1953); Dillard and Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 160 (1955).