[Civ. No. 16286.   First Dist., Div. One.    Aug. 3, 1955.]

GENA REE MONROE O'KEEFE, as Administratrix, etc., Respondent, v. THE APTOS LAND AND WATER COMPANY (a Corporation) et al., Appellants.

Carlyle Miller for Appellants.

Courtney L. Moore and Sans, Hudson & Perry for Respondent.

WOOD (Fred B.), J.—This is an appeal in two quiet title actions involving three adjoining parcels of real property. Although the actions were not formally consolidated, they were tried together and resulted in a single set of findings of fact and conclusions of law and a single judgment in favor of the plaintiff. The defendants have appealed.

Plaintiff, administratrix of the estate of L. G. Monroe, deceased, tried the case upon the theory that she had acquired title by adverse possession; defendants, upon the theory that Monroe did not hold adversely, that he took possession under an oral agreement to buy, but never paid any consideration for the land.

The trial court found: (1) between April 1, 1938, and the date of his death, November 30, 1941, L. G. Monroe and defendant L. J. Miller were officers and directors in defendant Aptos Land and Water Company, Inc. (hereinafter called Aptos) and in defendant Peninsula Properties Company, Ltd. (hereinafter called Penproco) and were the sole stockholders in Aptos; that continuously since the death of Monroe, L. J. Miller has been and is a director and officer in Aptos and Penproco; (2) two stockholders' accounts were carried on the books of Aptos, of which account No. 205 showed a balance owing to L. G. Monroe and account No. 206 showed a balance owing to L. J. Miller by Aptos; (3) on November 30, 1941, Aptos was indebted to L. G. Monroe in the sum of $41,684.41 as shown by the credit balance of said account No. 205; (4) defendant Penproco was the owner of the three parcels here involved and these parcels were a part of a large tract containing many other parcels, all subject to a bond indenture mortgage; (5) on May 1, 1935, Penproco and Aptos made an agreement pursuant to which Aptos could sell land in said tract in its own name and could obtain conveyance to the

purchaser by delivering to defendant Santa Cruz Land Title Company bonds of Penproco in a stipulated amount for the property sold, whereupon the title company would secure from the trustee for the bondholders, a reconveyance of the property so sold, and would then convey the same to the nominee of Aptos; (6) between April 1, 1938, and November 30, 1941, L. G. Monroe and defendant L. J. Miller entered into an agreement on behalf of Aptos and as directors and the sole shareholders of Aptos by the terms of which Aptos agreed to sell to Monroe said three parcels and to convey to Monroe a clear title thereto in consideration of which Monroe's stockholder account with Aptos was to be charged with the agreed value of the property; (7) the amount of land involved in said agreement was 137 acres and the agreed value was $225 per acre or a total of $30,825; (8) after making the agreement Monroe did everything required of him to be performed under the terms of the agreement and with the acquiescence, knowledge and approval of Aptos and Penproco entered into and took possession of the property; (9) in performance of the agreement there was delivered to the title company the requisite amount of bonds necessary to secure reconveyances from the trustee to the title company and the title company obtained such reconveyances to it.

Pursuant to conclusions of law drawn from these findings the judgment credited $30,825 of the balance appearing on the books of Aptos to the credit of Monroe as full payment by plaintiff of the purchase price of the property; directed the title company as escrow agent of Penproco to execute and deliver to plaintiff a deed conveying title to the property; directed Penproco to execute any and all necessary documents and perform all necessary acts to accomplish the conveyance of title to plaintiff; declared that plaintiff was at the time of filing the complaint and now is the owner of the property in fee simple and entitled to the possession thereof and that the defendants have no right, title or interest in the property.

The defendants' principal challenge is their claim that the evidence does not support the findings that Monroe and Miller agreed upon the acreage (137 acres) which Monroe was to acquire and that they agreed upon the value ($225 per acre).

The evidence, both testimonial and circumstantial, which supports the 137-acre finding is substantial and adequate. It is the total acreage of the three parcels in question. In 1938 Monroe built a home on one of the parcels and took up his residence there. He improved the land by grubbing out

native trees and shrubs and planting orchard trees upon all three of the parcels and progressively constructed a fence around the outside of all three, a fence which was nearly completed prior to his death in 1941. L. J. Miller testified that in 1939 Monroe told him he intended to get a larger place than he originally contemplated and Miller told Monroe it was all right with Miller and then Monroe said he wanted the other two parcels adjoining the one he had first selected. After several inquiries by Miller, Monroe told Miller he wanted to acquire all three of the parcels. There is also evidence tending to show that Monroe during his lifetime paid taxes on all three parcels, not just one or a portion of them. It appears also that reconveyances for all three of the parcels were obtained from the trustee for Penproco's bondholders. There is evidence that these reconveyances were based upon bonds of Penproco which Monroe and Miller furnished to Aptos, Aptos delivered to the title company, and the title company presented to the trustee.

Concerning the "agreed" value, the record is not as clear. At one time L. J. Miller testified that Monroe agreed the price would be the book cost of the property to Penproco, which was $450 per acre. He also testified it has been his position since the death of Monroe that Monroe owed either Penproco or Aptos an undetermined amount as the purchase price of the land; that the amount of consideration for the land was to be subsequently agreed upon by him and Monroe but they never did fix it. His brother, Carlyle Miller (associated in business with L. J. Miller and an officer of Aptos since the death of Monroe, one of the attorneys of record for the defendants, and expressly authorized to speak for L. J. Miller), took the same position at conferences of the parties or their attorneys which he attended during the pendency of this litigation. At one of these conferences, Carlyle said " 'Our position is this: Mr. Monroe built the house on the property, there is no question about that at all, with his own funds,—there has never been any desire on the part of L. J. Miller, myself or the corporations to contest that fact. The only thing is Mr. Monroe paid no consideration for the land itself. We have tried in various conferences, starting in 1942, with Mr. O'Keefe, Mr. Holloway Jones and yourself, both orally and in writing, to adjust that matter,—certainly the title is clouded but the cloud can be removed by settling that point.' " At another conference Carlyle said "we" don't know what figure to place on it. He said this property upon the books

was approximately $450 an acre but that neither he nor L. J. Miller considered it worth that much at the time Monroe took it, or later. At one time Carlyle took the position that some compromise should be reached between "nothing and 450." Defendants pleaded, as to parcel one, that the consideration was subsequently to be agreed upon, has not yet been determined, should be determined by the court if the court finds that plaintiff is the owner.* Defendants tried the case as if these pleadings applied also to parcels two and three.

Yet, when explaining why no charge for the purchase price was entered against Monroe upon the books of Aptos, L. J. Miller said it was because Monroe delayed and never did tell Miller how much of parcels two and three he wanted, the witness adding that as soon as that were known it would have been a simple matter to compute the total, multiplying the price per acre by the number of acres. That, obviously, was predicated upon there being an "agreed" value.

A still different explanation given by L J. Miller for the lack of a charge against Monroe on the Aptos books was that Monroe endeavored to persuade Miller to take for his own use a comparable amount of land, charging its purchase price to Miller on the books of Aptos, so that the respective accounts of Monroe and of Miller would be about the same in amount. Miller considered this suggestion but ultimately decided against it. In the process, apparently, the entry of a charge against Monroe was neglected and not made.

---

*In the answer to the complaint which involves parcel one the defendants allege that Monroe entered into possession and agreed to pay Penproco "a consideration for said real property to be thereafter agreed upon" and that Monroe "did not at any time prior to his death repudiate said agreement and did not, prior to his death, as aforesaid, pay any valuable or other consideration whatsoever to the said Peninsula Properties Company, or any one on its behalf, for said real property or any part thereof."

In Penproco's cross-complaint in the suit which involves parcel one it is alleged that Monroe agreed to pay Penproco a consideration for parcel one, a consideration "to be subsequently agreed upon" and "that in the event that it should be determined by a decree of this Court that plaintiff herein is the owner of said real property, said decree should be conditioned upon payment to said Peninsula Properties Company of a sum not less than the cost to said Peninsula Properties Company of said property, and the whole thereof."

In the cross-complaint it is also alleged that in the event of a judgment in favor of plaintiff Penproco should be awarded a lien as vendor upon the property for the amount of said cost, which amount is claimed by Penproco. One of the clauses of the prayer of the cross-complaint is that if the court should decree that plaintiff is the owner of parcel one, a judgment should be made and entered decreeing that Penproco or the title company for and on behalf of Penproco has a lien as vendor upon said property "for such sum or sums as this Court may determine."

In response to a statement by the trial court that further evidence was needed upon the question of the price to be paid for the property, the parties stipulated that the book cost to Penproco was $450 per acre, but that the reasonable value of the land was $225 per acre. The court then made a finding that Monroe and Miller entered into an agreement on behalf of Aptos by the terms of which Aptos ''agreed to sell to . . . Monroe . . . and to convey to said Monroe a clear title to said land in consideration of which Monroe's stockholder account was to be charged with the agreed value of said property; that the amount of land involved in said agreement was 137 acres, and the agreed value was $225.00 per acre, making a total consideration of $30,825.00.''

It is apparent that the trial court did not believe Miller's testimony that Monroe expressly agreed to pay the amount of the book cost to Penproco, $450 per acre. It reasonably could infer that Monroe would not agree to pay double the reasonable value of the property. Also, the court was not required to believe Miller's testimony that they expressly agreed to determine the price at a later date. It could infer that they simply did not discuss the price. Monroe is dead. His lips are sealed. Miller is the only person living who is capable of testifying as to what took place between them and he is an interested witness.

█ In this situation these principles apply: ''It has always been the rule that courts and juries are not bound by mere swearing no matter how positive, unless it be credible swearing. It may bear within itself the seeds of its own destruction, as where it is inherently improbable, or its destruction may be wrought from without, as where the person swearing is in some manner impeached. In either case court and jury are entitled to disbelieve the testimony if they choose, and if they do refuse it credence it is of no more effect than if it had not been given. It disappears from the case and the inference opposed to it is no longer contradicted.'' (*Market Street Ry. Co.* v. *George,* 116 Cal.App. 572, 576 [3 P.2d 41]. See also *Hicks* v. *Reis,* 21 Cal.2d 654, 659-660 [134 P.2d 788]; *Blank* v. *Coffin,* 20 Cal.2d 457, 460-462 [126 P.2d 868]; *Huth* v. *Katz,* 30 Cal.2d 605, 608-609 [184 P.2d 521]; *Tingey* v. *E. F. Houghton & Co.,* 30 Cal.2d 97, 101-102 [179 P.2d 807]; *Langley* v. *Pacific Gas & Elec. Co.,* 41 Cal.2d 655, 663 [262 P.2d 846]; *Perske* v. *Perske,* 125 Cal.App.2d 795, 801-802 [271 P.2d 528]; *Lombardi* v. *Tranchina,* 129 Cal.App.2d 778, 780 [277 P.2d 938].)

The trial court may have believed that although the parties

intended that Monroe pay for the property, no definite price had been determined, perhaps had not even been discussed. In such a case, to prevent an inequitable result, the court could imply a reasonable price. ▮ "When a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, . . . the consideration must be so much money as the object of the contract is reasonably worth." (Civ. Code, § 1611.) In that case it is the function of the trier of the facts to ascertain and declare the reasonable value of the property involved. (See *Dickerman* v. *Ohashi Importing Co.*, 63 Cal.App. 101, 105-107 [218 P. 458]; *First Bank of Jamestown* v. *Gillis*, 104 Cal.App. 523, 527-528 [286 P. 451]; *Carney* v. *Hayter*, 62 Cal.App.2d 792, 797-798 [145 P.2d 712]; *Great Western Distillery Products, Inc.* v. *John A. Wathen Distillery Co.*, 10 Cal.2d 442, 446 [74 P.2d 745]; *Toomy* v. *Dunphy*, 86 Cal. 639, 643 [25 P. 130].)

This, we believe, is what the trial court had in mind. The use of the words "agreed value" in the findings must have had reference to the fact that the parties litigant "stipulated and *agreed* that the reasonable value of the land, the subject of these actions, was the sum of $225 per acre" (emphasis added), and thus was a finding that the reasonable value of the land was $225 per acre, not a finding that the parties to the contract (L. G. Monroe and L. J. Miller) expressly agreed that it was worth $225 an acre. ▮ The findings of fact and conclusions of law are, of course, judicial "writings" which are subject to interpretation in accordance with substantially the same canons of interpretation as statutes, contracts, and other "writings." (*Verdier* v. *Verdier*, 121 Cal. App.2d 190, 193 [263 P.2d 57].)

Defendants argue that, in the absence of a stipulated price, the contract was too uncertain to be enforced. ▮ The mere fact that an agreement is silent as to price does not necessarily make it unenforceable. "A valid contract of sale may be made without any stipulation as to the price, the law in such a case implying that the price is the reasonable value of the thing which is the subject-matter of the agreement. This is, however, no exception to, but rather a special instance of, the foregoing rule [that a contract may not be enforced unless it is complete and certain in all material terms]; because such a contract does, in fact, by operation of the law, furnish a means of exactly ascertaining and fixing the price." (Pomeroy's Specific Performance of Contracts (3d ed.) p. 382, § 148; see also 12 Cal.Jur.2d 311, § 109.)

Defendants contend that the finding that Monroe did everything required of him to be performed under the terms of the contract is not supported by the evidence. The only thing that remained to be done was to enter an appropriate charge against Monroe upon the books of Aptos; i. e., to charge his account with $30,825, the purchase price of the land. The trial court may well have inferred that Monroe appropriately left the making of that entry to L. J. Miller, who testified that he handled the finances for both corporations, Aptos and Penproco. Moreover, the defendants have not suffered by the delay. Monroe's credit balance, $41,684.41, exceeded the amount of the charge. No loss ensued from the delay in making the entry.

Monroe's credit balance was not barred by the statute of limitations. ▪ His credit balance and Aptos' right to the purchase price of the land have continuously been and are "cross-demands" of the type mentioned in section 440 of the Code of Civil Procedure and are, therefore, "deemed compensated so far as they equal each other." Even if the statute of limitations runs against one of such demands, that demand may be set off in a suit to recover the other demand. (*Jones* v. *Mortimer,* 28 Cal.2d 627, 632 [170 P.2d 893]; *Sunrise Produce Co.* v. *Malovich,* 101 Cal.App.2d 520, 522-524 [225 P.2d 973].)

▪ Nor did the fact that an action which plaintiff had brought against Aptos on the book account was dismissed for lack of prosecution, cancel that account or the credit which it evidenced. A judgment of dismissal in such a case is not upon the merits and is not res judicata. (*Gonsalves* v. *Bank of America* (1940), 16 Cal.2d 169 [105 P.2d 118]; *Atchison, T. & S. F. Ry. Co.* v. *Rollaway Window Screen Co.* (1951), 101 Cal.App.2d 763 [226 P.2d 763].)

▪ Defendants belatedly claim the bar of section 339(1) of the Code of Civil Procedure. They did not assert that claim in the trial court. They pleaded only section 318 of the code. Moreover, they pleaded the agreement, relied on it, and introduced evidence to support it and prove it. It does not lie with them now to say it was barred by the two-year statute of limitations.

▪ Also belatedly, the defendants now for the first time assert the bar of the statute of frauds. They did not present that as an issue in the trial court insofar as our examination of the record discloses. Besides, they are equitably estopped from relying upon the statute of frauds. In reliance upon this

oral agreement which he made with L. J. Miller, his close and intimate business associate of many years, Monroe went into possession and made extensive permanent improvements at a cost of not less than $35,000. Miller visited the property frequently, knew of these expenditures and of Monroe's reliance upon him, yet stood by, failed to make the debit entry against Monroe in the Aptos books. To allow Miller and the corporation he acts for to use the statute of frauds as a bar to enforcement of the agreement would result in a total loss of Monroe's investment. It would, doubtless, also entail the loss of the entire amount of Monroe's credit balance against which, it would appear, the statute of limitations has run except to the extent of the offset allowed by section 440 of the Code of Civil Procedure. In contrast, the solution which the findings and judgment effectuate is just and fair and equitable to both parties. Plaintiff pays and defendants receive the reasonable value of the land.

Defendants' point that this equitable estoppel is not available to plaintiff because she did not plead it is not well taken. How was plaintiff to plead it? Defendants brought the agreement into the picture by their pleadings and proof, with no mention of the statute of frauds. (See 18 Cal.Jur.2d 412-413, Estoppel, § 13. Moreover, it would appear that the doctrine of part performance obtains here and renders the statute of frauds unavailable as a bar to plaintiff's actions. (See 23 Cal.Jur. 465-469, Specific Performance, §§ 34-36.)

Defendants invoke the rule that an action to quiet title may not be maintained by the holder of an equitable interest against the legal owner. The reason for that rule does not obtain here. It is not a case of a plaintiff who under the guise of a general plea of ownership seeks to prove facts showing fraud or other grounds of constructive trust or reformation of a deed and thus take the defendant by surprise. (See *Aalwyn's Law Institute* v. *Martin*, 173 Cal. 21, 26 [159 P. 158]; *Kennedy* v. *Scally*, 62 Cal.App. 367, 370-371 [217 P. 96]; *Bacon* v. *Bacon*, 21 Cal.App.2d 540, 544-545 [69 P.2d 884].) Instead, it is a case in which the defendants, in their effort to show that Monroe's possession was permissive, not adverse, produced the facts which showed the agreement and proved his equitable title. That was not the case of a plaintiff taking a defendant by surprise. Besides, the defendant who holds the legal title in this case (the title company) is virtually a mere stakeholder. No one questions its legal title. It does not claim more than the bare legal title. The con-

test is between the plaintiff and the other defendants, concerning the equitable title: Does the title company hold for the benefit of the plaintiff or for the benefit of defendant Penproco?

Defendants' remaining points are to the effect, principally, that various of the findings were not within the issues framed by the pleadings. One complete answer is that all of the facts which the court treated as material, as indicated by its findings, were treated by the parties as if in issue, and the case was fully tried upon that theory. As said in *Buxbom v. Smith*, 23 Cal.2d 535, 543 [145 P.2d 305], ". . . the matter of pleading becomes unimportant when a case is fairly tried upon the merits and under circumstances which indicate that nothing in the pleadings misled the unsuccessful litigant to his injury."

Defendants say there is neither pleading, evidence, nor a finding that the consideration to be paid for the land was adequate or that the contract was just and reasonable. The absence of a pleading and the immateriality thereof, we have explained. The stipulation that the reasonable value of the land was $225 and the finding that the "agreed value" was in that amount, spell adequacy of consideration and justness, fairness and reasonableness of the contract. Under the circumstances we see no error, certainly no prejudice to the defendants, in the lack of an express finding in that regard.

Defendants further contend that evidence introduced in one action cannot be considered in the other for lack of a stipulation therefor. Apparently counsel started the trial with an understanding that from time to time as evidence was offered they would identify the action in which presented and would stipulate whether it would be available in the other action if relevant thereto. But almost immediately that plan was abandoned. Nearly all the evidence went in without limitation and, as we read the record, was treated by court and counsel as introduced in both actions, to the extent relevant.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied September 2, 1955, and appellants' petition for a hearing by the Supreme Court was denied September 28, 1955. Traynor, J., was of the opinion that the petition should be granted.