[L. A. No. 22408. In Bank. Apr. 7, 1953.]

LENORA FRANCES SAPORITO et al., Respondents, v. PUREX CORPORATION, LTD. (a Corporation), Appellant.

Moss, Lyon & Dunn, Sidney A. Moss, Bert W. Hendrickson and Henry F. Walker for Appellant.

Gray, Binkley & Pfaelzer and John T. Binkley for Respondents.

GIBSON, C. J.—Mrs. Lenora Saporito and her husband brought this action against defendant, a California corporation, to recover for personal injuries sustained by Mrs. Saporito when a quart bottle of Purex, a bleaching solution prepared and bottled by defendant, burst in her hands. The case was tried without a jury, and judgment was entered for plaintiffs. The question presented on this appeal is whether the evidence is sufficient to support the findings that defendant was negligent and that its negligence proximately caused Mrs. Saporito's injuries.

The bottle which injured Mrs. Saporito was filled in defendant's plant in St. Louis, Missouri, about four months prior to the accident, and it was packed in a corrugated cardboard carton which contained 12 quart bottles. Cardboard dividers inside the carton held each of the bottles firmly in place and prevented any contact between them. The carton was sealed in the plant and was sent to a wholesale distributor who, in turn, shipped it to Jarman's Grocery Store, which was located in Columbus, Kansas, about three blocks from Mrs. Saporito's home. The carton, still sealed and in an undamaged condition, arrived at the store within 10 days of the accident, and Jarman knew of nothing that happened which might have injured the bottle while it was in the store.

Mrs. Saporito purchased the bottle of Purex at Jarman's store, took it directly to her home, and started to open it as soon as she arrived there. She held the bottle in her left hand about six inches in front of her chest, a foot and a half from her face, and began to twist the cap with her right hand, using no tools or instruments. Before she was able to loosen the cap, the bottle exploded leaving the bottom portion in her left hand and the top part in her right hand. The explosion propelled Purex and small particles of glass into Mrs. Saporito's face, causing fragments of glass to puncture her skin and penetrate her eyes. The bottle was later re-

constructed, revealing a hole on its shoulder surrounded by several "very obvious bruises."

An expert testified that in his opinion the explosion was caused by a combination of forces set up in the bottle and was the result of internal pressure and some external pressure, such as twisting the cap, combined with the presence of a defect or bruise in the area where the failure of the bottle had its origin. He also stated that bruises can weaken a bottle to such an extent that it will have very little resistance to impact or internal pressure. There was evidence that Purex is an unstable chemical solution which decomposes gradually, forms a gas and, when bottled, creates gas pressure. Some pressure results from decomposition under normal conditions, and considerably more is created when the solution comes into contact with organic or metallic impurities or when it is exposed to heat or ultraviolet light. Defendant used only new bottles and did not wash them or inspect them for impurities.

The bottles were designed to release pressure by means of a diaphragm on the underside of the cap which, when pressure was exerted from within, was supposed to flex upward and expose two notches on the lip of the bottle through which gas could escape. This venting device was supposed to operate when the pressure in a bottle reached 6 to 10 pounds. However, it does not appear that defendant ever ascertained if this was a safe pressure, and an officer who was familiar with production operations in the St. Louis plant testified that he knew of no tests which were made to determine whether the cap actually vented when subjected to that amount of internal pressure.

The bottles used by defendant had the weakest outside surface of any bottles in commercial use and were, therefore, the least likely to resist impact or pressure. Defendant did not examine any bottles to determine the strength of the glass, although a polarscope test was available for this purpose and was in common usage. The bottles were first placed on the production line in groups of 12 arranged as they would appear in a shipping carton, and, at this time, they were inspected visually at a rate of 48 per minute. Thereafter, another visual inspection was made as they passed along the production line in single file at a rate of 96 per minute. From 38 to 48 bottles were broken each day in the St. Louis plant as a result of mechanical failures and other causes occurring in the production process.

The words "Keep in Cool Place" were written on Purex bottles and on the cartons in which they were shipped. These words were not accompanied by any warning that exposure to heat might produce an excessive pressure. The glass, which was amber-colored, was supposed to shield the solution from ultraviolet light, but it was not tested by defendant to ascertain if it would do so.

A serious risk of harm to consumers is created when a product which might explode is offered to the public as a safe household commodity. ■ Defendant was under a duty to employ techniques and practices in the preparation and bottling which were reasonably designed to prevent dangerously defective bottles of the solution from reaching the market. (See *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 520 [203 P.2d 522]; *Escola* v. *Coca Cola Bottling Co.*, 24 Cal. 2d 453 [150 P.2d 436]; *DeCorsey* v. *Purex Corp.*, 92 Cal.App. 2d 669 [207 P.2d 616].) Since several months might elapse before the product reached a consumer, an unsafe amount of gas could accumulate in a bottle which did not have an adequate venting device, particularly if decomposition of the solution was accelerated by contact with impurities or exposure to heat or ultraviolet light. ■ As we have seen, defendant's venting device was designed to operate when the internal pressure was between 6 to 10 pounds, but it could be inferred from the evidence that defendant made no tests to determine whether the device would in fact operate at that pressure. Of all types of commercial glass for bottles, that used by defendant was the least likely to withstand impact or pressure, yet no tests were made by defendant to measure the strength of its bottles, although a polarscope test was commonly used for this purpose. Further, defendant failed to take steps to prevent an unsafe accumulation of gas, such as washing and inspecting the bottles for the removal of impurities and testing the glass to determine whether its amber coloring would effectively exclude ultraviolet light. ■ Moreover, the words "Keep in Cool Place" would not necessarily serve to warn purchasers that exposure of the solution to heat could produce an explosion, and they could be read as indicating only that heat would impair the effectiveness of the liquid as a bleaching solution. The violence of the explosion is evidence that the bottle contained a dangerously excessive pressure. ■ Clearly an unsafe amount of gas would not have accumulated if the venting device had functioned as it was supposed to do, and a failure of the device to release the

pressure could be attributed to defendant's negligence in not testing its caps properly.

The bottle here involved, when reconstructed, had a hole in its shoulder surrounded by several bruises, and there was expert evidence that the explosion was caused in part by bruises. Inasmuch as bruises can seriously weaken a bottle and reduce its resistance to pressure, defendant should have exercised due care to prevent defective and damaged bottles from reaching the market. It appears that from 38 to 48 bottles were broken each day in defendant's plant by the failure of machinery and similar causes, and it could be inferred that many more were bruised and injured in the production process after the first visual examination. The second inspection was made during production at the rate of 96 bottles per minute, and it could be found that such a rapid inspection was not reasonably designed to prevent dangerously damaged bottles from reaching the market and that defendant should have made a more thorough examination. There was evidence that the bottle was not damaged or mistreated after it left defendant's possession, and it could be inferred that the bottle was defective when it left defendant's plant and that, if defendant had exercised due care, the defective bottle would not have escaped detection and would not have been sold to Mrs. Saporito.

The evidence is sufficient to support the findings that defendant was negligent and that such negligence was the proximate cause of Mrs. Saporito's injuries.

The judgment is affirmed.

Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I concur in the judgment of affirmance but would base the holding of this court upon the doctrine of res ipsa loquitur, as the facts clearly bring the case within the purview of that doctrine. This was the view of the trial court and of the District Court of Appeal by which court the case was first decided (see *Saporito* v. *Purex Corp., Ltd.* [1] (Cal. App.) 243 P.2d 910). In a well reasoned opinion written by Mr. Justice Fox the District Court of Appeal cited and relied upon the numerous cases heretofore decided by this court and the District Court of Appeal holding the res ipsa loquitur doctrine applicable in exploded bottle cases such as this

[1] A hearing was granted by the Supreme Court on June 26, 1952.

(see *Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453 [150 P.2d 436]; *DeCorsey* v. *Purex Corp.*, 92 Cal.App.2d 669 [207 P.2d 616]; *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514 [203 P.2d 522]).

In my opinion there was no justification whatsoever for this court granting a hearing and redeciding this case as it was correctly decided by the District Court of Appeal. The hearing in this case was granted in harmony with the policy of the present majority of this court to reexamine fact issues in negligence cases (see *Pirkle* v. *Oakdale Union etc. School Dist., ante,* pp. 207, 213 [253 P.2d 1]) and particularly cases involving the doctrine of res ipsa loquitur (*Hardin* v. *San Jose City Lines, Inc.,* [2](Cal.App.) 252 P.2d 46) and last clear chance (*Daniels* v. *City & County of San Francisco* [3](Cal.App.) 246 P.2d 125; *Sills* v. *Los Angeles Transit Lines,* [4](Cal.App.) 246 P.2d 65) even though such cases have been correctly decided by the District Court of Appeal. I have heretofore stated that I do not agree with this policy as it imposes an unnecessary burden upon this court which is now faced with the determination of numerous difficult legal problems to the solution of which the efforts and energies of the members of this court should be devoted instead of undertaking to reexamine and restate the more simple rules and doctrines which should be and are settled by a long line of well considered cases. Such is the situation in the case at bar and the same situation exists in numerous cases now pending before this court involving similar problems which were correctly decided by the District Courts of Appeal as will appear when the decisions in these cases are announced by this court.

---

[2]A hearing was granted by the Supreme Court on March 12, 1953.

[3]A hearing was granted by the Supreme Court on Sept. 11, 1952.

[4]A hearing was granted by the Supreme Court on Sept. 11, 1952.