[Civ. No. 23522. Fourth Dist., Div. Two. Oct. 1, 1981.]

JOHN NORTON FARMS, INC., Plaintiff and Appellant, v. TODAGCO et al., Defendants and Respondents.

**COUNSEL**

Clayson, Rothrock & Mann, James L. Craig and Roy H. Mann for Plaintiff and Appellant.

Brown & Vars, Ronald Tracy Malone, Haight, Dickson, Brown & Bonesteel, Michael J. Bonesteel and Roy G. Weatherup for Defendants and Respondents.

**OPINION**

**ZIEBARTH, J.\*—**

---

\*Assigned by the Chairperson of the Judicial Council.

# I

## STATEMENT OF THE CASE

This is an appeal by the plaintiff, John Norton Farms, Inc., from an order for nonsuit entered in favor of the various defendants which was granted by the Honorable Fred R. Metheny on March 5, 1980, pursuant to defendants' motion for nonsuit following the close of opening statements during the retrial of this case.

# II

## STATEMENT OF FACTS

This case involves an action that was filed by the plaintiff back on July 2, 1973, to recover damages from the various named defendants as the result of the loss of a crop of dry bulb onions in the Blythe area of Riverside County. After certain demurrers were sustained with leave to amend, on October 12, 1973, plaintiff filed its verified amended complaint for damages.[1]

In its amended complaint, plaintiff set forth six causes of action as grounds for recovery for general damages of over $700,000 for the loss of an onion crop and also punitive damages in the amount of $400,000.

The basic thrust of the amended complaint was that plaintiff had purchased from the defendant Todagco, a corporation, a retail seller, having its principal place of business in Blythe, California, an herbicide product known as "Tenoran 50 WP." That particular product had been manufactured by the defendant CIBA-GEIGY CORPORATION. The amended complaint alleged that plaintiff purchased 76 pounds of the product on February 7 and 15, 1973. It also alleged that the product "was defective as a result of the failure of the defendants, and each of them, to give directions or warnings as to the use of Tenoran to prevent it from being unreasonably dangerous, and said Tenoran was unsafe for its intended use in that under certain conditions, when applied as directed on the label and as instructed by the defendants, and each of them, said Tenoran would kill dry bulb onion plants."

---

[1]See clerk's transcript, volume I, pages 62 through 77, inclusive.

The amended complaint then alleged that "on or about February 11, 12, 17, and 18, 1973 . . . plaintiff used the Tenoran so purchased by applying it to growing dry bulb onions owned by plaintiff for the purpose of weed control . . . ." Further that " . . . as a direct and proximate result of said defect described above, said onions were totally killed and destroyed, all to plaintiff's damage in the amount of $700,000."

Thereafter, responsive pleadings were filed on behalf of all of the named defendants and various cross-complaints for indemnity were also filed.

Following the completion of discovery, the case was set for trial for May 2, 1978. The first trial commenced on May 3, 1978, before Judge Richard Marsh. Thereafter, on May 17, 1978, a motion for mistrial was granted by Judge Marsh. However, the court ordered that bifurcation of the issues of liability and damages would stand as previously ordered.[2]

The case was set for retrial for February 26, 1980, and the retrial actually started on February 27, 1980, before Judge Metheny.

After the jury had been selected, counsel for the plaintiff, Mr. Craig, proceeded to give his opening statement to the jury. Mr. Craig told the jury that this case involved the loss by his client of virtually its complete crop of dry bulb onions that were growing in its field numbers 9, 34, and 35 in the Palo Verde Valley area near Blythe, California, due to herbicide poisoning.

Mr. Craig also told the jury that dry bulb onions were planted in the three fields in late October or early November 1972. He indicated that his client started experiencing a problem with weeds in all three of the subject fields where the onions had been planted. The plaintiff then consulted with the defendant, Garn Stanworth, who was apparently a plant entomologist, to obtain his advice as to what to do about the weed problem. Stanworth apparently inspected all three fields in January 1973, and then recommended to plaintiff's farm manager, Robert Micalizio, that a product called "Tenoran" be used to kill the weeds. In

---

[2]Between the granting of the mistrial motion and the start of the second trial, the plaintiff settled with the defendantns FMC Corporation, Western Farm Services and Wilbur-Ellis for the total amount of $5,000 as confirmed by an order signed by Judge Marsh on January 14, 1980.

February 1973, the herbicide Tenoran was purchased from the defendant Todd Agricultural Company (i.e., Todagco, a corporation) whose principal was Robert Todd.

Mr. Craig then told the jury that the chemical was sprayed on the three fields. It later rained and the onions in all three fields died because of herbicide poisoning.

In summary, Mr. Craig told the jury: "Basically what this case is about is it's a problem with an inadequately designed label, which induced people to misapply a chemical. You're going to hear some evidence that a chemical was applied to the onion fields and that eventually the onions died. And it's our position that the onions died as a result of the chemical; that the chemical was applied in a manner which the manufacturer of the chemical and the distributor of the chemical knew it was being applied, and by reason of the knowledge that they had, given the fact of the label that was applied to the product, the package to use it by, the persons using it had insufficient information to make proper decisions and recommendations concerning the use of it. And as a result of that, the crop died."[3]

At the conclusion of Mr. Craig's opening statement to the jury, counsel for the defendant CIBA-GEIGY Corporation, Mr. Bonesteel, made a motion for nonsuit. The basis for his motion was the fact that Mr. Craig had indicated to the jury that "he intended to prove that there was one application of Tenoran, in which the onions worked, and it was only after a second application of the Tenoran that there was a crop failure."

Mr. Bonesteel argued that because there was no place on the label where it said that a user could apply Tenoran twice *to onions*, that the use by the plaintiff was "outside the label." In other words, as Mr. Bonesteel stated "we have a situation where there was no damage to this crop whatsoever until there was a double application, which was not called for on the label. Counsel said that that's what he intends to prove; and if that's what he intends to prove, there is no liability on the statutes established by the State of California."[4]

---

[3]See clerk's transcript, page 17.
[4]Food and Agriculture Code sections 12811, 12825, subdivision (d), and 12855.

Counsel for the defendants Todagco, and Garn Stanworth joined in the motion for nonsuit.

Counsel for the plaintiff responded that Tenoran was certainly an "economic poison" under the statutory definition. He also agreed that by statute, "the Director [of the Department of Agriculture] must refuse to register one [an 'economic poison'] which he has information to believe that it would be harmful, and *I also agree that there is no liability for use contra to the printed* instructions." (Italics added.)

Mr. Craig went on to argue to the trial court that: *"But what we have in this case, your Honor, is we have an inadequate instruction.* We have an instruction which, one, doesn't say to use a chemical once or twice or ten times or zero times. It doesn't say anything concerning it. And secondly, we have a situation here where information was available from which the manufacturer could have knowledge of certain propensities . . . ." (Italics added.)

Mr. Craig then pointed out to the trial court that California Administrative Code, title 3, section 2395, formerly section 2425,[5] requires that a label must contain a warning statement to prevent injury to marketable crops in a place sufficiently prominent to warn the user, and the warning must state clearly and in nontechnical language the underlying particular hazard involved in the use.

After taking the defendants' motion for nonsuit under submission, the trial court finally ruled in favor of the moving parties and granted the motion. This appeal then resulted.

### III

#### CONTENTIONS OF THE PARTIES

A. *Appellant's Contentions*

1. That a warranty disclaimer must be strictly construed against the manufacturer.

2. That the registrant of an economic poison is required by law to give specific warnings of potential harm attendant to its use.

3. That the product "Tenoran" was misbranded.

---

[5]California Administrative Code, title 3, section 2395.

4. That the manufacturer of an herbicide has a duty to provide warnings concerning its proper use.

5. That only a manufacturer who has provided an adequate warning is exempt under the law from liability.

6. That the exemption from liability provided by Food and Agricultural Code section 12855 is only available where the injury or damage is suffered *solely* by reason of the enumerated events.

B. *Contentions of Respondent CIBA-GEIGY Corporation:*

1. That the registrant-manufacturer of an economic poison is not liable for any injury or damage which was occasioned by the use of such economic poison for purposes not indicated on the label.

2. That the legislative mandate of the Food and Agricultural Code may not be overcome by resort simply to general principles of tort law.

3. That the appellant-plaintiff misused and misapplied several chemicals and such misuse was the *sole* cause of any and all damage to its onion fields.

4. That the burden of proof imposed on appellant-plaintiff regarding its claim concerning the nonapplicability of Food and Agricultural Code section 12811, 12825, subdivision (d) and 12855 was not met.

C. *Contentions of Respondent Todagco, a Corporation:*

This particular respondent adopted the four contentions of the respondent CIBA-GEIGY Corporation, and it also asserts the following additional contention on its own:

1. That because appellant-plaintiff made no reference in its opening statement, it cannot now contend on appeal that this particular respondent had any additional duty to warn its customers above and beyond any warning contained on the manufacturer's label.

IV

ISSUES ON APPEAL

A. Must a warrant disclaimer be strictly construed against the manufacturer?

B. Is the registrant-manufacturer of an economic poison required by law to give specific warnings of potential harm attendant to its use?

C. Was the subject product, "Tenoran," misbranded?

D. Does the manufacturer of an herbicide have a duty to provide warnings concerning its proper use?

E. Is only a manufacturer who has provided an adequate warning exempt under the law from liability?

F. Is the exemption from liability provided by Food and Agricultural Code section 12855 only available where the injury or damage suffered was *solely* by reason of the enumerated events?

G. Did the appellant-plaintiff meet the burden of proof imposed on it regarding its claim concerning the nonapplicability of Food and Agricultural Code sections 12811, subdivision (d) and 12855?

H. Did the appellant-plaintiff misuse and misapply several chemicals and if so, was such misuse the *sole* cause of any and all damage to its onion fields?

I. Is a registrant-manufacturer of an economic poison liable for any injury or damage which was occasioned by the use of such economic poison for purposes not indicated on the label?

J. May the legislative mandate of the Food and Agricultural Code be overcome by resort simply to general principles of tort law?

K. Did appellant-plaintiff in its opening statement claim that the respondent Todagco, a corporation, had any additional duty to warn its customers above and beyond the manufacturer's label?

L. If not, is it barred from raising this issue on appeal?

V

DISCUSSION

The basic issue before this court is whether the trial court committed reversible error in granting the motion joined in by several of the defen-

dants for nonsuit after plaintiff's counsel had completed his opening statement to the jury that had been selected, sworn and seated in the case.

The matter of motions for nonsuit is governed by Code of Civil Procedure section 581c. It presently reads in pertinent part as follows: "After the plaintiff has completed his opening statement ... in a trial by jury, the defendant ... may move for a judgment of nonsuit.

"If the motion is granted, unless the court in its order for judgment otherwise specifies, such judgment of nonsuit operates as an adjudication upon the merits."

Witkin in his authoritative work entitled 4 California Procedure (2d ed 1971) section 350, page 3150, indicates that such a motion "is the modern equivalent of a *demurrer to the evidence*; it concedes the truth of the facts proved, but denies that they, as a matter of law, sustain the plaintiff's case" citing as authority the cases of *Bush* v. *Wood* (1908) 8 Cal.App. 647, 650 [97 P. 710] and *Archibald Estate* v. *Matteson* (1907) 5 Cal.App. 441, 445 [90 P. 723].

■ As noted above, the parts of the statute we have quoted specifically allow a motion for nonsuit to be made and for the trial court to grant such a motion immediately after the opening statement. It has been held that it is proper for a trial court to grant such a motion made immediately after the completion of plaintiff's opening statement, where it appears that counsel for the plaintiff has stated all the facts that he expects to prove and that these would not make a prima facie case. (See *Willis* v. *Gordon* (1978) 20 Cal.3d 629, 633 [143 Cal.Rptr. 723, 574 P.2d 794] [reversal]; *Russell* v. *Soldinger* (1976) 59 Cal. App.3d 633, 641 [131 Cal.Rptr. 145] [affirmance; action based solely on illegal contract]; *Smith* v. *Roach* (1975) 53 Cal.App.3d 893, 897 [126 Cal.Rptr. 29] [reversal]; *Calrow* v. *Appliance Industries, Inc.* (1975) 49 Cal.App.3d 556, 560 [122 Cal.Rptr. 636] [affirmance]; *Palazzi* v. *Air Cargo Terminals, Inc.* (1966) 244 Cal.App.2d 190, 194 [52 Cal.Rptr. 817]; *Wright* v. *Arcade School Dist.* (1964) 230 Cal.App.2d 272, 275 [40 Cal.Rptr. 812] [counsel, in response to trial judge's inquiry, replied that his opening statement described the ultimate facts he was prepared to prove, and these were determined by the court to be insufficient to establish a legal duty on part of defendant toward plaintiff].)

Also, since the motion for nonsuit is designed to call attention to correctable defects, granting such a motion after the plaintiff's opening statement can be upheld only where it is clear that counsel has stated all the facts. (See *Rodin* v. *American Can Co.* (1955) 133 Cal.App.2d 524, 534 [284 P.2d 530] and *Weyburn* v. *California Kamloops, Inc.* (1962) 200 Cal.App.2d 239, 241 [19 Cal.Rptr. 357].) The record in the case at bench indicates that plaintiff's counsel was given every opportunity to state all of the facts he hoped to prove to establish his case against each of the defendants.

It is also a fundamental rule that the motion should state the precise grounds on which it is made, with the defects in the plaintiff's case clearly and particularly indicated. This gives the plaintiff an opportunity to cure the defect by introducing additional evidence. (See citations collected at 4 Witkin, Cal. Procedure (2d ed. 1971) § 361, pp. 3158-3159.) The record in this case reveals that counsel for the defendant CIBA made it clear that his motion for nonsuit was based on the indication in the opening statement of plaintiff's counsel that his client sustained the loss of its onion crop after it had applied the chemical Tenoran *twice* to the onion crop in question which was "outside the label." Counsel for said defendant then argued that if that is what plaintiff intended to prove, said defendant had no liability based on Food and Agricultural Code sections 12811, 12825, subdivision (d), and 12855 as indicated above.

Witkin, *supra*, (at p. 3159) states that: "[a]s a corollary to the rule just stated . . . only the grounds specified should be considered by the lower court in its ruling, or by the appellate court on review. If these are insufficient, a nonsuit is improper, even though other good grounds exist, for the plaintiff's attention was not called to them and he had no opportunity to eliminate them," citing as authority the case of *Moore* v. *Moffatt* (1922) 188 Cal. 1, 5 [204 P. 220].

Witkin goes on to state that "[t]his would seem to be true on appeal from an order either *denying or granting* a nonsuit. (1) If the lower court *denies* the motion, the appealing defendant has no real complaint where he has failed to specify the proper grounds. (2) If the court *grants* the motion, the appealing plaintiff should be able to insist that the reviewing court confine its consideration to the grounds specified below notwithstanding the existence of other good grounds; otherwise he is deprived of the opportunity to correct defects." (See *Jacobs* v. *Freeman* (1980) 104 Cal.App.3d 177, 188 [163 Cal.Rptr. 680]; *Smith*

v. *Roach* (1975) 53 Cal.App.3d 893, 898 [126 Cal.Rptr. 29]; and citations collected at Witkin, *supra*, at p. 3159.)

■ The record in this case indicates that after the motion for nonsuit was argued by all counsel and the court indicated it was about to rule on the motion, plaintiff never asked for an opportunity to modify or add to his opening statement. Therefore, the cautionary rule (that suggests that in keeping with the object of the nonsuit procedure, the plaintiff should ordinarily be given an opportunity, after the motion is made, to modify or add to it) is inapplicable to the case at bench. (See *Mendez* v. *Pacific Gas & Elec. Co.* (1953) 115 Cal.App.2d 192, 195 [251 P.2d 773].)

■ Code of Civil Procedure section 581d, as amended in 1963, now provides that all dismissals ordered by the trial court (which includes nonsuits) must be in the form of a written order signed by the court and filed in the action. (See citations collected at Witkin, *supra*, at p. 3161.) However, unlike the motion itself, the order does not have to specify the grounds or reasons for granting it. (*Kinney* v. *County of Contra Costa* (1970) 8 Cal.App.3d 761, 770 [87 Cal.Rptr. 638].) The order of the trial court granting defendants' motion for nonsuit and dismissing the subject action was in writing as required.

Although there were no apparent procedural deficiencies in the consideration by the trial court of defendant's motion for nonsuit, the record reflects the fact that there certainly was a procedural anomaly which was utilized by the trial court in its consideration of the subject motion. That procedural anomaly was the consideration of potential evidence in the case in addition to the contents of plaintiff's opening statement and the oral argument of counsel.

The record of the hearing on defendants' motion indicates that the trial court considered the various exhibits that had been received into evidence during the prior trial of the subject case. The trial court also asked counsel for a specimen of any other labeling that had been used and a specimen label was produced which was marked as defendants' "D" and was apparently received in evidence along with all of the other exhibits pursuant to the stipulation of all counsel.

■ This unusual procedure that was followed by the trial court and counsel raises the question of whether the scope of the matters that can

properly be considered by a court in passing on a motion for nonsuit after opening statement can be expanded by the stipulation of all affected counsel?

As we observed above, even though a trial court that is called upon to determine the merits of a motion for nonsuit after opening statement is normally restricted to considering only the grounds set forth in the motion and the precise contents of the plaintiff's opening statement, presumably the parties through their respective counsel have the power to expand the permissible scope of the trial court's review to also include the evidentiary exhibits that would probably be offered into evidence during the course of ensuing trial if the motion had not been made and granted.

Having stipulated to the consideration by the trial court of certain documentary evidence, the appellant-plaintiff is now estopped to contend on appeal that it was improper for the trial court to consider such matters before ruling on respondent-defendants' motion for nonsuit after opening statement.

Having determined that there were no procedural deficiencies in the consideration of defendants' motion for nonsuit by the trial court, we now proceed to determine whether the motion was properly granted based on the standards discussed above. Confining our consideration only to the grounds raised in defendants' motion, the contents of plaintiff's opening statement and also the various exhibits which counsel stipulated the trial court could consider, we have determined that the motion should not have been granted by the trial court.

By way of explanation of the reasons why we have reached this conclusion, we first of all discuss the background of the statutes and appellate decisions that apply to the question of whether the double application of the chemical Tenoran released the defendants from any liability in this case as a matter of law.

It appears to be undisputed that the chemical product called "Tenoran" (which was manufactured by the defendant and respondent on appeal, CIBA-GEIGY Corporation and retailed to the plaintiff-appellant by the defendant-respondent on appeal, Todagco) was the type of chemical that is termed an "economic poison" by statute in California.

(Food & Agr. Code, § 12753.)[6] This particular statute is part of the present statutes relating to the regulation and control of chemical substances defined as economic poisons which are based on the original statute which was entitled the "California Economic Poison Act of 1921."[7]

The three statutes mentioned by counsel for defendant CIBA as a basis for his motion for nonsuit, (namely, Food & Agr. Code, §§ 12811, 12825, subd. (d), and 12855) read in pertinent part as follows:

Section 12811: "Every manufacturer of, importer of, or dealer in any economic poison, except a person that sells any raw material to a manufacturer of any economic poison or a dealer or agent that sells any economic poison which has been registered by the manufacturer or wholesaler, shall obtain a license from the department before the economic poison is offered for sale."

Section 12825: "Pursuant to Section 12824, the director may, after hearing, cancel the registration of, or refuse to register, any economic poison:

"(a) Which has demonstrated serious uncontrollable adverse effects either within or outside the agricultural environment.

"(b) The use of which is of less public value or greater detriment to the environment than the benefit received by its use.

"(c) For which there is a reasonably effective and practicable alternate material or procedure which is demonstrably less destructive to the environment.

---

[6]California Food and Agricultural Code section 12753 defines the term "economic poison" as follows:
"'Economic poison' includes any of the following:
"(a) Any spray adjuvant.
"(b) Any substance, or mixture of substances which is intended to be used for defoliating plants, regulating plant growth, or for preventing, *destroying*, repelling, or mitigating any and all insects, fungi, bacteria, *weeds*, rodents, or predatory animals or any other form of plant or animal life which is, or which the director may declare to be, a pest, *which may infest or be detrimental to vegetation, man, animals or households, or be present in any environment whatsoever.*" (Italics added.)
[7]Statutes of 1921, chapter 729.

"(d) Which, when properly used, is deterimental to vegetation, except weeds, to domestic animals, or to the public health and safety.

"(e) Which is of little or no value for the purpose for which it is intended.

"(f) Concerning which any false or misleading statement is made or implied by the registrant or his agent, either verbally or in writing, or in the form of any advertising literature.

"In making any such determination, the director may require such practical demonstrations as are necessary to determine the facts."

Section 12855: "Except as otherwise provided in this article, the registrant is not liable for any injury or damage which is suffered solely by reason of any of the following:

"(a) The use of the economic poison for a purpose which is not indicated by the label.

"(b) The use of the economic poison contrary to the printed directions of the registrant or seller.

"(c) The breach of any warranty by the registrant which is not expressly printed on the label."

The reading of these three statutes together would cause one to conclude that they appear to say that the manufacturer of any economic poison that is capable of being detrimental to vegetation and has therefore been registered with and licensed by the Department of Agriculture, is not liable for any injury or damage which is suffered *solely* by reason of the use of same contrary to the printed directions of the registrant or seller.

The label that was attached to the Tenoran containers when they were purchased by the plaintiff corporation from Todagco contained the following information inter alia:

"TENORAN
"50 WP Herbicide

"TENORAN is a selective herbicide for weed control in soybeans, strawberries, carrots, and *dry bulb onions.*

"TENORAN 50 WP when applied according to direction will selectively control annual weeds in soybeans, strawberries, carrots, and *onions*, such as:

"Annual Grass Weeds

| | |
|---|---|
| "Annual bluegrass | Crabgrass |
| "Barnyardgrass | Goosegrass |
| "Brachiaria | Lovegrass |

"Annual Broadleaf Weeds

| | | |
|---|---|---|
| "Black nightshade | Jimsonweed | Ragweed |
| "Carpetweed | Lambsquarters | Sicklepod |
| "Chickweed | Morningglory | Shepherdspurse |
| "Cocklebur | Pigweed | Smartweed |
| "Florida Pusley | Puncturevine | Spurry |
| "Groundsel | Purslane | Velvetleaf |
| | | Wild mustard |

"TENORAN 50 WP at recommended rates will not control most established perennial weeds.

"TENORAN is most effective for the control of weeds after the cotyledons have opened, but before they have reached a height of two inches.

"A postemergence application of TENORAN should be made when broadleaf weeds are less than two inches high and grass weeds are no more than 1/2 inch high.

"TENORAN 50 WP may cause some temporary yellowing or burning, or small necrotic spots on strawberry, soybean, carrot, and *onion leaves*, but this usually lasts for only a short time and the plants resume their normal growth. Do not apply TENORAN 50 WP on crops under stress. Thoroughly re-work soil before planting succeeding crops." (Italics added.)

That label appears to comply with the basic statutory requirements of Food and Agricultural Code section 12851. That particular statute reads as follows:

Section 12851: "The registrant of any economic poison shall attach to each separate lot, and each separate, finished, sealed, or closed container or package of economic poison which he intends to sell within this state, a plainly printed label, that states all of the following:

"(a) The name, brand, or trademark, if any, under which the economic poison is sold.

"(b) The name and address of the registered manufacturer, importer, or vendor."

However, the real question is whether the label satisfied the more specific requirements of a companion statute, Food and Agricultural Code section 12852 which relate to the directions for use included in the language contained on either the label on an economic poison container or in the written directions enclosed inside of the container. That particular statute reads as follows:

Section 12852: "The registrant of any economic poison which is sold or delivered to a consumer in this state *shall furnish printed directions for use, and dilution if any, upon the label, or shall inclose the printed directions in each container or package of the economic poison.*" (Italics added.)

The trial court received in evidence a specimen label for TENORAN 50 WP herbicide (plaintiff's exhibit "D") and also a paper bag capable of holding six pounds of TENORAN 50 WP which contains printed instructions thereon (plaintiff's exhibit "B").

The specimen label first of all states in rather large type that: "TEN-ORAN is a selective herbicide for weed control in soybeans, strawberries, carrots, and *dry bulb onions.*" (Italics added.) It also contains "Directions for Use" on the back side which read as follows for dry bulb onions:

"DRY BULB ONIONS: TENORAN 5 WP should be applied at the broadcast rate of 6.0 to 8.0 pounds per acre. Use as a postemergence over the top spray after onions have reached the 2 to 3 true leaf stage of growth. Do not apply within 30 days before harvest.

"For use in Arizona, *California*, Colorado, Idaho, Nevada, New Mexico, Oregon, Texas, Utah, and Washington—TENORAN 50 WP

should be applied at the broadcast rate of 4.0 pounds per acre plus 1.00% emulsifiable, non-phytotoxic oil with U.R. No. of 93 or greater which has been tested and found to be compatible with TENORAN 50 WP *when applied to onions*. For use on mineral soils only. Use as a postemergence, over-the-top application after onions have reached the 2 true leaf stage of growth. If applied to onions before the 2-leaf stage, serious injury may result. Do not use more than 6.0 pounds TENORAN 50 WP per acre on light sandy soils when sprinkler irrigation is used. [Emphasis added.]

"Do not use TENORAN 50 WP on light sandy soils with less than 1% organic matter. Do not tank mix other pesticides with TENORAN. Do not apply TENORAN ten days before or after the application of sulfuric acid, Chloro IPC, diazinon, or maneb fungicides.

"MIXING INSTRUCTIONS: MAKE CERTAIN SPRAY EQUIPMENT HAS BEEN THOROUGHLY CLEANED BEFORE USING THIS PRODUCT. TENORAN 50 WP should be thoroughly mixed as a paste or thick slurry in a separate container before adding to the spray tank. The spray tank should contain 1/3 to 1/2 the total amount of water to be used before adding the slurry. The recommended rate of TENORAN 50 WP should be applied in 25 to 40 gallons of water per acre, using conventional power sprayers, or in a minimum of 5 gallons of water for aerial application. Agitate strongly by mechanical or by-pass means in the spray tank. Avoid leaving spray mixtures in tank without constant agitation. If by-pass agitation is used, it should terminate at the bottom of the tank to minimize foaming. Screen opening should be 50 mesh. Use Tee Jet nozzle tips 8002 to 8006, or equivalent.

"For a band treatment of TENORAN, use Tee Jet nozzle tips 8002E to 8006E, or equivalent. The following formula may be used to calculate the amount of TENORAN 50 WP needed for band treatment.

$$\frac{\text{band width in inches}}{\text{row width in inches}} \times \begin{array}{c}\text{rate per acre} \\ \text{for broadcast} \\ \text{treatment}\end{array} = \begin{array}{c}\text{amount needed} \\ \text{for band} \\ \text{treatment}\end{array}"$$

In plaintiff's second amended complaint for damages, appellant alleged five different causes of action against the various named defendants. The first cause of action was based on strict liability based on the alleged failure of the defendants ". . . to give directions or warnings as to the use of Tenoran to prevent it from being unreasonably

dangerous" when used as intended. Appellant further alleged in its first cause of action that defendants failed to give directions or warnings that: ". . . Tenoran was unsafe for its said intended use in that, when applied as directed on the label and as instructed by the defendants . . ., said Tenoran would sometimes kill dry bulb onion plants."

The second cause of action was based on alleged false oral and written representations and breach of express oral and written warranties by defendants Todagco and CIBA "that said Tenoran was fit for the purpose of killing certain weeds in fields of growing dry bulb onions when said Tenoran was used in accordance with defendants Todagco and CIBA's directions and would kill said weeds without harming the onions."

In its third cause of action, plaintiff seeks damages from the defendants based on the theory of breach of implied warranty of merchantability. The fourth cause of action sounds in an alleged breach of implied warranty of fitness or suitability for a particular purpose.

The fifth and last cause of action alleges that the defendant CIBA negligently manufactured the product known as Tenoran by placing certain ingredients therein which were unsafe for application on onions and likely to kill onions if applied to them under certain conditions. Plaintiff further alleged that defendant CIBA, by the exercise of reasonable care, should have known of the latent defects in its product and negligently failed to warn appellant that Tenoran was unsafe for use on dry bulb onions, but to the contrary expressly stated orally and in writing to plaintiff that Tenoran was safe for use on dry bulb onions.

It appears to this court that so long as plaintiff's counsel mentioned sufficient facts in his opening statement that would establish a prima facie case for his client *under any one of the five causes of action mentioned above*, that plaintiff should not have been nonsuited after its opening statement. After all, the question of whether plaintiff used the product called Tenoran "outside its label" so as to make applicable the statutory immunity provided by section 12855 of the Food and Agricultural Code would be a question of fact for the jury to decide, unless reasonable minds could not differ as to the evidence on that question.

We agree with the contention advanced by some of the respondents to the effect that the question of whether or not the registrant-manufac-

turer of an economic poison is liable by statute for any injury or damage which is occasioned by the use of such poison for purposes not indicated on the label is still in most cases a question of law for the court to decide. However, the question of whether Tenoran was "misbranded" or whether the alleged misuse and misapplication of Tenoran on its onion fields by plaintiff was the *sole* cause of any and all damage to its onion fields, would be a jury question. Also, the question of whether any of the defendants failed to fulfill any duty to warn users such as plaintiff of the effect of rainfall, etc., on the use of Tenoran would also presumably be a question of fact for the jury to decide rather than a question for the trial court.

We have carefully reviewed the record[8] as to exactly what plaintiff's counsel covered in his opening statement to the jury. We have observed, first of all, that the contention of counsel for the defendant CIBA-GEIGY Corporation (i.e., Mr. Bonesteel) was accurate when he asserted that plaintiff's counsel had told the jury that his client had applied Tenoran to its fields 9, 34 and 35 *twice* during the period from late January, 1973, through mid-February, 1973. However, we have noted counsel for the plaintiff also told the jury that his client owned and operated several farms in the Palo Verde area near Blythe, California, where it raised dry bulb onions. Further, that his client had a weed problem in its onion fields. The jury was further advised that upon the advice and recommendation of a crop consultant by the name of Garn Stanworth, it purchased a chemical called Tenoran from Todagco. Further, that the chemical was manufactured by CIBA-GEIGY Corporation.

Counsel for the plaintiff also told the jury that the chemical Tenoran was applied to the onion fields and eventually the onions died. Further, that the onions died even though "... the chemical was applied in a manner which the manufacturer and the distributor of the chemical knew it was being applied ...."

Plaintiff's counsel also informed the jury to the effect that the evidence would show that the label on the chemical contained insufficient information to assist users of the chemical "to make proper decisions and recommendations concerning the use of it and that such lack of adequate information on the label resulted in the death of the onion crop."

---

[8]Clerk's transcript pages 14 through 21.

Mr. Craig, counsel for the plaintiff, also told the jury that they would hear evidence about some tests that had been conducted on Tenoran and also on its main active ingredient, a chemical called chlorxuron during the mid to late 1960's as to the effect of those chemicals on various types of plants and vegetation and also "the effect that moisture content might have to do with it" and also what "effect that an oil called nonphytotoxic oil might have on it."

The jury was also told by plaintiff's counsel that very shortly after the second application of Tenoran to the three fields of onions in mid-February of 1973, it rained. When plaintiff's farm manager, Robert Micalizio, went out shortly after the rain to look at the onions, he found them to be dead. Mr. Craig then told the jury that Mr. Micalizio found the onions to be "laying on the ground; the leaves were brown and yellow, and spots, what they called necrotic spots, were on the leaves, and they had all of the symptoms of an herbicide poisoning."

Mr. Craig also told the jury that they would hear testimony from an expert witness by the name of Mr. Norm Ronamus to the effect that the defendant CIBA-GEIGY had prior knowledge of some tendencies of the Tenoran (or its chlorxuron) to cause damage and that that defendant had a duty to put that information on the Tenoran label. Further, that the information contained on the Tenoran label was not adequate because "by reading the labels you couldn't know under what circumstances Tenoran may injure your onions."

After reviewing the opening statement of plaintiff's counsel along with the various theories of liability alleged in plaintiff's second amended complaint, we have concluded that although said opening statement may not have been as artfully presented as a Clarence Darrow would have staged, nevertheless under the standards discussed above, plaintiff's counsel satisfied the requirements of California law. The facts that Mr. Craig stated to the jury that he would prove, would have established a prima facie case of liability under several of plaintiff's five different theories of liability. We hold this to be true even though plaintiff's counsel did clearly admit in his opening statement that his client had applied Tenoran to its fields twice before the rains came in February of 1973. Plaintiff's opening statement was not plainly insufficient as a matter of law and, therefore, defendant's motion for nonsuit should have been denied rather than granted. ■ A nonsuit at the comple-

tion of plaintiff's opening statement is not favored and should be denied where the statement is not plainly insufficient as a matter of law. (See *Timmsen* v. *Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 868 [86 Cal.Rptr. 359] [granting of motion for nonsuit reversed]; *Weyburn* v. *California Kamloops, Inc., supra*, 200 Cal.App.2d 239, 241 [granting of motion for nonsuit reversed]; *Kaukonen* v. *Aro* (1956) 142 Cal.App. 2d 502, 504 [298 P.2d 611]; *Greenwood* v. *Mooradian* (1955) 137 Cal. App.2d 532, 534 [290 P.2d 955].)

■ The only basis upon which the trial court could have properly granted the motion for nonsuit was if the fact that the plaintiff had twice applied Tenoran to its fields before the rains came in February of 1973 barred plaintiff's claim against the various defendants under any of the five different theories advanced by it in its second amended complaint. We find that this position which has been advanced by defendants, both in their arguments before the trial court and also in this appeal, is not supported by either the facts or the law in this case for the following reasons:

*First* of all, the label that was contained on the quantity of Tenoran that plaintiff purchased from Todagco did not contain any *clear limitation* or *restriction* regarding a *second application* of such herbicide to an onion crop as counsel for the defendant manufacturer seems to be claiming.

■ *Second*, although we do agree with the contention of the defendants that a user of an economic poison such as Tenoran has the burden of either establishing use of the product in accordance with the instructions or directions contained in the product label or the nonapplicability of Food and Agricultural Code sections 12811, 12825, subdivision (d), or 12855 to prevail in a case such as the instant case, we disagree with the other contention of defendants to the effect that the legislative mandate of section 12855 may not be overcome by resort to general principles of tort law. In our opinion, the enactment of section 12855 did not abrogate the general rules adopted by the California Supreme Court in the case of *Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682, 693-694 [268 P.2d 1041], wherein the high court stated that: "In determining whether an effective disclaimer of the statutory warranties has been made, we must look to the *label as a whole*, and the general rule is that a disclaimer is to be *strictly* construed against the seller." (Italics added.) The *Burr* decision has been cited as authority for this

same proposition in the relatively recent cases of *Dorman* v. *International Harvester Co.* (1975) 46 Cal.App.3d 11, 19 [120 Cal.Rptr. 516] and *Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 519 [105 Cal.Rptr. 904]. As we indicated above, plaintiff's counsel mentioned in his opening statement that plaintiff would offer proof that the label on the Tenoran product was inadequately worded so that it failed to fully apprise a user as to the various known harms that might result from its use on a crop such as onions.

*Third*, the registrant of an economic poison still has a duty to give specific warnings of harm attendant to its use of which it is aware or should be aware.[9]

A warning statement which is necessary and adequate to prevent injury to marketable crops must appear on the label in a place sufficiently prominent to warn the user, and it must state clearly and in nontechnical language the underlying particular hazard involved in the use (Cal. Admin. Code, tit. 3, § 2395, formerly § 2425). In the instant case, plaintiff offered to present proof that the defendants had preexisting knowledge that Tenoran, applied immediately before a rainfall, would result in a condition where the toxicity of the chlorxuron in Tenoran would be increased to the level that in combination with the rain it would cause damage or injury to onions. No warning whatsoever with respect to potential damage due to rainfall appears anywhere on the label in question.

*Fourth*, the manufacturer of an herbicide such as Tenoran has a duty to provide clear directions and instructions concerning its proper use.[10]

---

[9]A manufacturer or supplier of a product must give warning of any dangerous propensity or dangerous condition of the article produced or sold by him *of which he knows or should know*, and which the user of the article would ordinarily not discover. (*Mark* v. *Pacific Gas & Electric Co.* (1972) 7 Cal.3d 170, 178 [101 Cal.Rptr. 908, 496 P.2d 1276]; *Tingy* v. *E. F. Houghton & Co.* (1947) 30 Cal.2d 97, 102-103 [179 P.2d 807]; *Lewis* v. *Terry* (1896) 111 Cal. 39, 44-45 [43 P. 398]; *Crane* v. *Sears, Roebuck & Co.* (1963) 218 Cal.App.2d 855, 861 [32 Cal.Rptr. 754]; *Morris* v. *Toy Box* (1962) 204 Cal.App.2d 468, 471-472 [22 Cal.Rptr. 572]; *Pedroli* v. *Russell* (1958) 157 Cal. App.2d 281, 284 [320 P.2d 873]; *Proctor & Gamble Co.* v. *Superior Court* (1954) 124 Cal.App.2d 157, 162 [268 P.2d 199]; *Gall* v. *Union Ice Co.* (1951) 108 Cal.App.2d 303, 309-310 [239 P.2d 48]; *Briggs* v. *National Industries, Inc.* (1949) 92 Cal.App.2d 542, 546 [207 P.2d 110]; see also, Rest.2d, Torts, § 388(b), Annot., Manufacturer's or seller's duty to give warning regarding product as affecting his liability for product caused injury 76 A.L.R.2d 9, and 50 Cal.Jur.3d, Products Liability, § 13, Duty to Warn, pp. 799-802.)

[10]To comply with its duty to give an adequate warning of any dangerous propensity of its product, the manufacturer or seller must appropriately label the product, giving

If the seller of a product knows that the product sold by him is dangerous, even though the circumstances under which the danger may occur are limited in number compared to the total number of uses for the product, he is negligent if he fails to warn of the latent defect. (*Proctor & Gamble Co.* v. *Superior Court, supra*, 124 Cal.App.2d 157, 162.) Plaintiff in this case offered to present proof that defendants knew that using Tenoran within the label under conditions of excessive rainfall would in fact kill onions.

■ *Fifth*, when reading the various statutes and codes together, we find a legislative intent to exempt a manufacturer of a registered economic poison *only* when such manufacturer has provided an adequate warning in its product label. Title 3, California Administrative Code, section 2395, formerly 2425, and section 2440, formerly 2435, place a mandatory duty upon a registrant/manufacturer to properly brand and provide adequate warnings as to their label and uses of the product. Food and Agriculture Code, section 12855, exempts from liability a registrant wherein the damage is suffered from a *use* of the poison *for a purpose not indicated on the label or contrary to the printed directions on the label*. Read together, the result would obtain that the exemption from liability of section 12855 would be available only to a registrant who had complied with Administrative Code, section 2395, formerly 2425, and section 2440, formerly 2435. Any other result would fly in the face of logic since a manufacturer would then have the ability to mislabel or misbrand an economic poison and still obtain exemption from liability.

*Sixth*, the exemption from liability under section 12855 is available to the manufacturer of a registered economic poison *only* where the injury or damage suffered by a plaintiff resulted *solely* by reason of the enumerated events. The key word in the statute is obviously, the word "solely."

In plaintiff's opening statement and in the argument of its counsel to the trial court in opposition to the motion for nonsuit, plaintiff offered proof that the inadequately worded label on the Tenoran containers, the failure to provide warning of a specifically known hazard, the additional

due consideration to the likelihood of accident and the seriousness of consequences from failure to so label it as to warn of any dangers that are inherent in it (*Tingy* v. *E. F. Houghton & Co., supra*, 30 Cal.2d 97, 102-103; see also *Saporito* v. *Purex Corp., Ltd.* (1953) 40 Cal.2d 608, 611 [255 P.2d 7]) or that may arise from improper handling (*Gall* v. *Union Ice Co., supra*, 108 Cal.App.2d 303, 309-310).

circumstance of the excessive rain and the prior knowledge that defendants possessed that such rain in combination with the previous application of Tenoran to an onion crop would cause either substantial damage or even complete destruction to an onion crop all were contributing causes of plaintiff's severe financial loss. It was for the jury to determine (after hearing all of the evidence presented during the trial) whether the plaintiff proved any of its theories of liability with a preponderance of the evidence.

 In the instant case, the failure of the trial court to make a finding (based upon the opening statements and the arguments on motion for nonsuit) that there were no other causes contributing to the plaintiff's injury except for the use of a poison for a purpose not indicated or the use of the poison contrary to the directions printed on the label constituted error. The trial court should have made a finding as to whether or not the damages resulted "solely" from an out-of-label use as the statute requires to afford exemption from liability to the manufacturer.

In conclusion, for the reasons discussed above, we find that the trial court erred in granting the defendants' motion for nonsuit at the completion of plaintiff's opening statement. Therefore, the judgment of the trial court is reversed with directions to vacate its order granting nonsuit against plaintiff and in favor of defendants.

Kaufman, Acting P. J., and McDaniel, J., concurred.